**Adham Mohammed Ali AWAD, Petitioner,**

v.

**Barack H. OBAMA, et al., Respondents.**

Civil Action No. 05–CV–2379.

United States District Court, District of Columbia.

Aug. 12, 2009.

· Ahmed Ghappour, Orrick, Herrington & Sutcliffe LLP, Michael W. Trinh, Diana Rutowski, Menlo Park, CA, Catherine Y. Lui, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, Glenn K. Jones, Rene Kathawala, Orrick, Herrington & Sutcliffe, New York, NY, Kathleen A. Orr, Orrick, Herrington, & Sutcliffe, LLP, Washington, DC, for Petitioner.

Scott Michael Marconda, Terry Marcus Henry, Alexander Kenneth Haas, David Hugh White, James C. Luh, Julia A. Berman, Kathryn Celia Mason, Patrick D. Davis, Rodney Patton, U.S. Department of Justice, Robert J. Prince, Washington, DC, for Respondents.

## MEMORANDUM ORDER DENYING WRIT OF HABEAS CORPUS

JAMES ROBERSTON, District Judge.

Adham Mohammed Al Awad, a citizen of [ b(1), b(6) redacted] alleges that he is illegally detained at Guantanamo Bay Naval Base and petitions this Court for a writ of *habeas corpus* to secure his release. The parties have cross-moved for judgment on the record. The government's motion will be granted.

### I. Background

Awad has been in U.S. custody since his capture in Afghanistan on [ b(2) redacted]. He filed his petition four years ago, but that petition and hundreds like it were put on hold until various legal issues, including the jurisdiction of this Court, were resolved. After the Supreme Court held that detainees like Awad have a right to

bring habeas petitions and that federal district courts have jurisdiction to hear them, *Boumediene v. Bush*, 553 U.S. ——, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), and after Judge Hogan issued his omnibus Case Management Order that has guided the Guantanamo habeas cases' procedures, this case moved on to the merits.

The government filed a factual return asserting the grounds on which Awad is detained—the claim is that he is an al Qaida fighter—and the evidence supporting that claim. Awad then made several requests for discovery. I denied some of those requests outright and denied others without prejudice to their later renewal with the kind of specificity required of motions under Fed.R.Civ.P. 56(f). Awad submitted his traverse without renewing his discovery requests. Both sides then moved for judgment on the record and a hearing on those cross-motions was held on July 31, 2008.

The government's core narrative is that Awad volunteered or was recruited for Jihad soon after September 11, 2001 and traveled from his home in [ b(1), b(6) redacted] to Afghanistan; that he trained at the Al Qaida "Tarnak Farms" camp outside Kandahar; that Awad and a group of other Al Qaida fighters were injured in a U.S. air strike at or near the airport in Kandahar and went to Mirwais Hospital for treatment; that these men then barricaded themselves in a section of the hospital; that U.S. and associated forces laid siege to the hospital; that Awad's comrades gave him up because they could not care for his severely injured [ b(1) redacted] and that, after Awad's capture, his al Qaida comrades fought to the death.

The government offers five groups of evidence in support of their narrative: (1) Intelligence reports of Awad's statements to interrogators; (2) statements of a former Guantanamo detainee named [ b(1), b(6) redacted] who was inside Mirwais Hospital during the siege and who gave a list of names and descriptions of the Al Qaida fighters, including a man with an [ b(1) redacted] who went by the name [ b(1), b(6) redacted] [ b(1), b(6) redacted]—a *kunya* allegedly associated with Awad [1]; (3) [ b(1), b(6) redacted]; (4) a list found at Tarnak Farms bearing the name [ b(1), b(6) redacted] and several of the names that also appear [redacted] on [ b(1), b(6) redacted] list of names; and (5) newspaper articles published in American newspapers about the siege at Mirwais Hospital.

Petitioner's story is that he traveled to Afghanistan in mid-September 2001 in order to visit another Muslim country for a few months, intending to return home after his visit; that in early November 2001 he was injured and knocked unconscious during an air raid while walking through a market in Kandahar; that he woke up in Mirwais Hospital after part of his [ b(1) redacted]; that he was heavily medicated, floated in and out of consciousness, slept constantly, and could barely sit up; and that he remained in this condition until his capture.

Awad's case relies mostly on weaknesses and holes in the government's evidence, but, in support of his narrative, he submits an unsigned affidavit, a declaration from his counsel, and different intelligence reports of different statements made to interrogators.

---

1. A *kunya* is a sort of traditional, honorific nickname. [ D(3) redacted] Decl. at 2. A man's *kunya* will often be the word "abu"—literally translated to mean father—and then the name of his first born child. *Id.* According to [ D(3) redacted]. Al Qaida members also use *kunyas* as honorific pseudonyms. *Id.* These *kunyas* are not dependent on whether an individual is a father and are sometimes used to conceal a true identity.

## II. Legal Standards

The President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization of Military Force, Pub. L. 107–04, 115 Stat. 224 (2001).

### A. Substantial Support

The government's position is that:

> [t]he President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who *were part of,* or substantially supported, Taliban or *al-Qaida forces* or associated forces that are *engaged in hostilities against the United States or its coalition partners,* including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

Respondent's Revised Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay at p. 3 (emphasis added).

In a thoughtful decision that has been followed by many if not most of the judges of this court, *Hamlily v. Obama,* 616 F.Supp.2d 63 (D.D.C.2009), Judge Bates wrote that the "key inquiry" when analyzing the "part of ... al Qaeda" test is "whether the individual functions or participates within or under the command structure of the organization—*i.e.* whether he receives and executes orders or di-

rections." *Hamlily,* 616 F.Supp.2d at 75 (internal citations omitted). I have adopted Judge Bates' approach.

### B. Hearsay, Authenticity, Chain of Custody

The government's case relies on "raw" intelligence data, multiple levels of hearsay, and documents whose authenticity cannot be proven (and whose provenance is not known and perhaps not knowable). Awad argues that such evidence should excluded because the government has not made individualized showings that "the hearsay evidence is reliable and that the provision of nonhearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security." CMO II(A). The government responds generally (not with individualized showings) that its intelligence documents are reliable because they were created during the intelligence gathering process and explains generally why the presentation of non-hearsay evidence would be a burden. The government urges that documents and reports generated for intelligence purposes should be accorded a presumption of reliability and credibility.

The suggestion of a presumption of reliability and credibility goes too far because it would seem to place the burden of rebuttal on the petitioner. I have instead formally "received" all the evidence offered by either side but have assessed it item-by-item for consistency, the conditions in which statements were made and documents found, the personal knowledge of a declarant, and the levels of hearsay. In other words, I have given the evidence the weight I think it deserves.

### C. Burden of Proof

The government had the burden of proving the lawfulness of detention by a

preponderance of the evidence. CMO II(A); *accord, Al Bihani v. Obama,* 594 F.Supp.2d 35 (D.D.C.2009); *Ali Ahmed v. Obama,* 613 F.Supp.2d 51 (D.D.C.2009). The burden of proof never shifted to Awad. No inference was drawn from Awad's decision not to testify or from his failure to sign or swear to his affidavit.

## D. Detention for the Continuation of Hostilities

██ I acknowledge the power of Judge Huvelle's argument in *Basardh v. Obama,* 612 F.Supp.2d 30, 34 (D.D.C.2009), that "the AUMF does not authorize the detention of individuals beyond that which is necessary to prevent those individuals from rejoining battle," but I decline to follow it in this case and have not considered whether or to what extent the continued detention of Awad supports the AUMF's self-stated purpose of "prevent[ing] . . . future acts of international terrorism," Pub. L. 107–04, 115 Stat. 224. Awad is a marginally literate [ b(1) redacted] who has spent more than seven of his twenty six years—since he was a teenager—in American custody. It seems ludicrous to believe that he poses a security threat now, but that is not for me to decide. Combat operations in Afghanistan continue to this day and—in my view—the President's "authority to detain for the duration of the relevant conflict" which is "based on longstanding law-of-war principles" has yet to "unravel." *See, Hamdi v. Rumsfeld,* 542 U.S. 507, 521, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).

## III. The Evidence

### A. "Then Why He Here"

[ b(1) redacted]  [ b(1) redacted] *See,* [ b(2) redacted] [ b(2) redacted] [ b(1), b(6) redacted] [ b(1), b(6) redacted] [ b(1), b(6) redacted] [2] [ b(2) redacted] [ b(2) redacted] [ b(1) redacted] [ b(1) redacted] [ b(1) redacted] [ b(2) redacted] [ b(1) redacted] [ b(1) redacted] [ b(1) redacted]; [ b(2) redacted] [ b(2) redacted] [ b(1) redacted] [ b(1) redacted]; [ b(2) redacted] [ b(1), b(6) redacted]

### B. Training

The name "Abu Waqas" appears twice (once crossed out) on a list of names found in a one hundred page document retrieved from Al–Qaida's "Tarnak Farms" training camp in Kandahar sometime after that facility was taken by U.S. and associated forces.[3] [ D(2) redacted] An intelligence report states that the document also contains notes on small arms and sniper training instruction, and aiming and distance calculations. [ C(2) redacted]

██ Awad denies any association with the name "Abu Waqas," but this denial is not credible. He has identified himself on at least one occasion as "Waqqas Adham Mohammed Ali Ala–Awad." ISN 88 FD–302 (May 4, 2002). [ b(1) redacted] [ b(1) redacted] [ b(1) redacted] [ b(2) redacted] [ b(2) redacted] At the merits hearing petitioner's counsel fine-tuned the argument to an assertion that Awad never used the honorific "Abu" before "Waqas." That position is inconsistent with the other evidence. "Abu" appears before 53 of the 59 names

---

**2.** In his affidavit, Awad claims that any incriminating statements he made were made "as a result of torture, the threat of torture or coercion and are therefore unreliable." Awad Aff. ¶ 5; Jones Aff. ¶ 7. The only specific allegation of coercion is the claim that interrogators threatened to withhold medical treatment until Awad provided them information. The government retorts that interroga-

tors' notes reveal that Awad was provided care and that he used his medical condition as an excuse to avoid answering difficult questions. [ b(1), b(2) redacted]

**3.** There is no dispute that Tarnak Farms was an Al Qaida camp that provided advanced training. *See, generally,* [ D(3) redacted] Decl.

on the Tarnak Farms list. [ᴰ⁽²⁾ redacted] [ᴰ⁽³⁾ redacted] Decl. at 2.

■ Except for the appearance of what seems to be his name on a list, however, the evidence that Awad received training at Tarnak Farms is nonexistent. We do not know the purpose of the list or when it was written. Even the translator claimed only that it was "possibly" a list of trainees. [ᴰ⁽²⁾ redacted] [ᵇ⁽¹⁾ redacted] [ᵇ⁽¹⁾ redacted] [ᵇ⁽¹⁾ redacted] Awad Aff. ¶¶ 3–6; [ᵇ⁽²⁾ redacted] [ᵇ⁽²⁾ redacted] [ᵇ⁽¹⁾ redacted] [ᵇ⁽¹⁾ redacted]; [ᵇ⁽²⁾ redacted] ("... never received any training."). [ᵇ⁽¹⁾, ᵇ⁽⁶⁾ redacted] [ᵇ⁽²⁾ redacted]. That account may be implausible, but, in the absence of better evidence on the government's side, I find the claim of Tarnak Farms training to be unsupported.

## C. Mirwais Hospital

The government relies mostly on newspaper articles to provide background information on the barricade and siege at Mirwais Hospital.[4] Awad has not asked that I disregard those articles, conceding that "they are informative on certain points." Tr 55:1–8. I will accordingly consider the articles sufficiently reliable on points that are not seriously disputed: that Al Qaida fighters entered and barricaded themselves inside the Mirwais Hospital at some time during the first week of December 2001; that U.S. and affiliated forces laid siege to the hospital; and that the siege ended in late January 2002 when U.S. associated forces confronted and killed the remaining members of the Al Qaida group. I will also turn to these articles to fill in evidentiary gaps when there is corroboration.

Awad concedes that he was captured in the Mirwais Hospital on [ᵇ⁽¹⁾ redacted] Tr 53:21–25. The government's primary evidence of Awad's involvement that he participated in the siege is statements by [ᶜ⁽⁶⁾ redacted] [ᶜ⁽⁶⁾ redacted] a former Guantanamo detainee who claimed to have been inside the hospital and to have spoken with the al Qaida fighters. ISN [redacted] FD–302 (June 6, 2002); [ᶜ⁽²⁾ redacted] [ᶜ⁽²⁾ redacted] [redacted], who was captured on December 25, 2001 (and who denies that he was part of al Qaida), told interrogators that he was in Afghanistan working with the charity Al Wafa; that one day he was hit by a car; that he woke up in Mirwais Hospital in the same room as the Al Qaida fighters; and that they struck up a conversation. ISN [redacted] FD–302 (June 6, 2002). They told him that they were involved in a car wreck[5] while fleeing a U.S. airstrike and talked about their weapons, although never saw any. [ᶜ⁽²⁾ redacted] [ᶜ⁽⁶⁾ redacted] also provided names descriptions for the surviving eight members of the al Qaida group, including an [ᶜ⁽¹⁾, ᶜ⁽⁶⁾ redacted] [ᶜ⁽¹⁾, ᶜ⁽⁶⁾ redacted] *Id.* Four of the other names that [ᶜ⁽⁶⁾ redacted] provided were identical to or transliterations of names listed near "Abu Waqas" on the Tarnak Farms document. *Compare,* [ᶜ⁽²⁾ redacted] *with,* [ᴰ⁽²⁾ redacted]

Awad was shown a picture of [redacted] but denied ever knowing him. ISN 88 FD–302 (October 15, 2002). [ᵇ⁽¹⁾, ᵇ⁽²⁾ redacted] [ᵇ⁽¹⁾ redacted] [ᵇ⁽¹⁾ redacted] [ᵇ⁽²⁾ redacted] Awad Aff. ¶ 8; [ᵇ⁽²⁾ redacted]

---

4. Karl Vick, *Hospital Detention of Arab Fighter Ends With Suicide,* Wash. Post, Jan 8, 2002, at A12; *Drew Brown, Al–Qauda Group Holed up in Hospital,* Phil. Inq., Dec. 30, 2001, at A10; Pamela Constable, *Kandahar Hospital Seige Ends in al Qaeda Deaths,* Wash. Post, Jan 28, 2002, at A12; Thomas E. Ricks & Karl Vicks, *U.S. Reports Calm in Afghanistan on Christmas Eve; At Kandahar Hospital, Arrest Brings Gunfire,* Wash Post, Dec. 25, 2001, at A21; *Drew Brown, Armed Patients, Not the Sick, Biggest Concern at Hospital,* Miami Herald, Dec. 26, 2001, at 21A.

5. Apparently there are many bad drivers in Afghanistan.

("When the [U.S.] airstrikes began in the city of Kandahar [Awad was separated from Sugara] and he never saw him again. [Awad] was pulling someone from the rubble of a bomb destroyed building when he was injured.... He woke up in a hospital...."). Awad asserts that after his leg was amputated he was "located near elderly patients and children" and that while at the hospital he was "semi-conscious and in continuous pain ... [and was] on pain medication throughout [his] time in the hospital that made [him] sleep." Awad Aff. ¶ 14. He "denied being with the other Arabs ... and offered that he was on the first floor of the hospital ... [but] was later moved to the second floor ... where there were other Arabs whom he did not know." ISN 88 FD–302 (October 15, 2002); Awad Aff. ¶¶ 12–13. [ b(1) redacted] [ b(1) redacted] [ b(1) redacted]" Awad Aff. ¶ 16; [ b(2) redacted] [ b(2) redacted][6] ("No weapons or documents were found on" Awad when he was arrested), an assertion that is uncontested.

■ The only first-hand evidence offered by the government about Awad's capture was the report of a March 2006 interview with a [ A(6) redacted] who claimed that he led the group that had taken Awad into custody. [ A(6) redacted] FM40 (March 15, 2006). That report is internally inconsistent, completely unreliable, and is given no weight. [ b(1) redacted] [ b(1) redacted] [ b(2) redacted] [ b(2) redacted] [ b(2) redacted] [ b(1) redacted] [ b(1) redacted]; [ b(2) redacted] [ b(2) redacted] [ b(1) redacted] [ b(1) redacted] [ b(1) redacted]

[ b(2) redacted] [ b(2) redacted] [ b(2) redacted] [ b(2) redacted] [ b(2) redacted] [ b(2) redacted] was a typographical error and that Awad's injury more likely occurred on December 2, 2001, the approximate date that the Al Qaida fighters barricaded Mirwais Hospital. Although there is some evidence to support this theory, *see,* ISN 88 [ C(2) redacted] [ C(2) redacted] (stating that the date of "capture" was "3 weeks ago,"),[7] I will not credit this convenient explanation. It does not explain why the [ b(2) redacted] states that Awad was injured on [ b(2) redacted]. Nor does it explain why a different typo in the [ b(2) redacted] was later corrected, while the [ b(2) redacted] date was left unchanged. *Compare,* [ b(2) redacted] *with,* [ b(2) redacted] *see,* Res. MJR at 26.[8]

## D. [redacted]

Up to this point, we have (a) a reasonable inference that Awad went to Kandahar to fight, (b) no reliable evidence that he was actually trained there, (c) undisputed evidence that he was in Mirwais Hospital during part of the siege, and (d) inconsistent evidence about how and when he arrived there. [redacted] Five of their names match names found on the list provided by [ C(6) redacted] [ C(6) redacted] and three of them match names found on the Tarnak Farms document. [redacted] [ D(2) redacted] [ D(2) redacted] *and* [ C(2) redacted] [redacted] That remark finds corroboration in a newspaper account of a fighter who was killed trying to escape the siege at Mirwais *after* the date that Awad was captured. Karl Vick, *Hospital Detention*

---

6. [ b(2) redacted] are derivative documents reflecting an accumulation of information from other sources. Tr 32:21–23.

7. The parties are in general agreement that "capture" in this document should be read as "injury." Tr. 52:2–54:9; Res. Opp. 26–28.

8. [ b(1) redacted] [ b(1) redacted] [ b(1) redacted] [ b(2) redacted] [ b(2) redacted] Although this undermines the credibility of any information from that document, the government was unable to find the underlying document from which the November 1, 2001, date was taken. Tr 33:19–23. Because the November date is favorable to Awad and it is not refuted with equally strong evidence, I will assume it to be accurate.

*of Arab Fighter Ends With Suicide,* Wash. Post, Jan 8, 2002, at A12.

[redacted] [9],[10].

Awad denies that [redacted] He denies having met al-Dhali or al-Fadhl. Awad Aff. ¶ 7. He argues that, because the siege at Mirwais Hospital was a well-publicized event, al-Dhali would have known that Awad was captured, and would not have guessed that he was hiding. Awad also points out [redacted]

The following table demonstrates the importance [redacted] The correlation among the names on the al Joudi list, the Tarnak Farms list, [redacted] is too great to be mere coincidence. The [redacted] believe, the points that tip the scale finally in the government's favor.

| [ C(6) redacted] List [redacted] | [redacted] [redacted] | Tarnak Farms List | [redacted] [redacted] |
|---|---|---|---|
| [ C(6) redacted] [redacted] | [redacted] [redacted] | [ D(6) redacted] [redacted] | [redacted] [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] [redacted] | [redacted] [redacted] | [redacted] [redacted] |
| [ C(6) redacted] with an amputated right leg | [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] | Abu Waqas | [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] |
| [ C(6) redacted] | [redacted] | [ D(6) redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] |
| [redacted] | [redacted] | | [redacted] |

## IV. Conclusion

■ The case against Awad is gossamer thin. The evidence is of a kind fit only for these unique proceedings [redacted] and has very little weight. In the end, however, it appears more likely than not that Awad was, for some period of time, "part of" al Qaida. At the very least Awad's confessed reasons for traveling to Afghanistan and the correlation of names on a list [redacted] clearly tied to al Qaida make it more likely than not that he knew the al Qaida fighters at the hospital and joined them in the barricade.

\*　　\*　　\*

The petition for writ of habeas corpus is denied.

---

9. The government relies on an identification of [ A(6) redacted] by another detainee given during an interrogation taken at Bargram, Afghanistan. ISN [ A(2) redacted] FM40 (June 14, 2004).

10. [redacted] the Guantanamo detainee told interrogators that he guarded the Kandahar Airport from after September 11, 2001, until mid-November 2001. ISN [redacted] FD–302 (November 1, 2002). Although Awad argues out that this would have prevented [redacted] from training at Tarnak Farms when Awad would have been there, that is not necessarily true. [redacted] said that he had trained at the Al Faruq camp, and it is logical that an Al Qaida guard would receive advanced training.