# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued April 5, 2010          Decided June 2, 2010

No. 09-5351

ADHAM MOHAMMED ALI AWAD, DETAINEE, U.S. NAVAL
BASE, GUANTANAMO BAY, CUBA,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-02379-JR)

---

*John L. Ewald* argued the cause and filed the briefs for appellant. *Catherine Y. Lui* entered an appearance.

*August E. Flentje*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Robert M. Loeb*, Attorney.

Before: SENTELLE, *Chief Judge*, GARLAND, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Adham Mohammed Ali Awad, a detainee at Guantanamo Bay, Cuba, appeals from the district court's denial of his petition for a writ of habeas corpus. We find no reversible error in the district court's finding that Awad was "part of" al Qaeda in December of 2001. Awad admits that he traveled to Afghanistan in mid-September 2001 for the purpose of engaging in armed conflict against U.S. and allied forces. Evidence from multiple sources clearly supports the proposition that in December of 2001 Awad joined a group of al Qaeda fighters who had barricaded themselves inside a hospital and that these al Qaeda fighters treated Awad as one of their own. The correctness of the district court's factual findings is further confirmed by the appearance of Awad's name on several al Qaeda documents. We also reject Awad's challenges to the district court's legal holdings as the issues have already been resolved by a prior decision of this court. Accordingly, we affirm the district court's denial of Awad's petition for a writ of habeas corpus.

I.   BACKGROUND

A.   Legal Framework

In the wake of the terrorist attacks of September 11, 2001, the Congress of the United States passed a joint resolution "[t]hat the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." *Authorization for Use of Military Force*, Pub. L. No. 107-40, 115 Stat. 224 (2001)

("AUMF"). Acting under the authority of the AUMF, the United States initiated a military campaign in Afghanistan against the Taliban regime and the al Qaeda forces it protected. In pursuit of this campaign and in other parts of the world, still acting under the AUMF, the United States has captured and detained members of the enemy force. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518-524 (2004) (plurality op.).

The United States houses some of the detainees it captures at a secure military base at Guantanamo Bay, Cuba. The proper role of federal courts in evaluating the military's long-term detention of individuals held at Guantanamo Bay has developed over the past decade and has involved all three branches of government. The history of the litigation over the jurisdiction of federal courts to review the United States's detention of individuals at Guantanamo Bay is set forth in *Boumediene v. Bush*, 128 S. Ct. 2229, 2240-42 (2008), and we need not repeat the history here. *Boumediene* settled the question of our jurisdiction by holding that United States courts do have jurisdiction to entertain petitions for writs of habeas corpus from such prisoners. The present case involves such a petition.

B. The Events at Mirwais Hospital

On or about December 7, 2001, a small number of injured al Qaeda fighters (around nine) entered the Mirwais Hospital in Afghanistan. These fighters went to the second floor, barricaded themselves inside, and held their position through the display of weapons and the threat of killing everyone in the building. Local Afghan and allied forces laid siege to the hospital to try and break the al Qaeda barricade. This siege was to last for almost two months. During this time, the part of the hospital not under al Qaeda control continued to function and treat patients.

Only two people left the barricaded area alive. On

December ■, 2001, Majeed al Joudi ("al Joudi"), purportedly one of the al Qaeda fighters, was tricked into leaving the barricaded area and was captured by Afghan forces. His captors quickly turned him over to United States forces. Interrogators obtained a number of statements from al Joudi during subsequent interrogations. Then on December ■, 2001, the al Qaeda fighters surrendered a man with an amputated right leg to the Afghan forces at the hospital. This man was quickly transferred to U.S. control. During subsequent interrogation, the United States was able to identify this man as Adham Mohammed Ali Awad ("Awad"), a Yemeni national who had traveled to Afghanistan in mid-September 2001, and the petitioner before us.

The siege on the hospital continued for another month. In early January, one of the al Qaeda fighters was killed by his own grenade as he attempted to escape from the barricaded area. The standoff finally ended the last week of January 2002, when Afghan and allied forces killed the remaining al Qaeda fighters and retook the area of the hospital they had held.

C. This Litigation

Awad, who has been held at Guantanamo Bay, Cuba, since shortly after his capture in 2001, filed a petition in 2005 for a writ of habeas corpus in the United States District Court for the District of Columbia. The district court stayed Awad's petition during the jurisdictional litigation leading to *Boumediene*. After *Boumediene* established that federal courts have jurisdiction to hear petitions for writs of habeas corpus from detainees at Guantanamo Bay, the district court lifted the stay of Awad's case.

The government responded to Awad's petition and asserted that it had the authority to detain Awad under the AUMF. As

part of its defense of its detention of Awad, the government filed a factual return in the district court.

The government introduced into evidence multiple statements from Awad's interrogations. Awad told his interrogators that he was born in 1982 in Khor Maxar, Yemen. He traveled to Kandahar, Afghanistan in mid-September 2001. In either November or December of 2001, he was injured in an air raid; his injuries were serious enough to require eventual amputation of his right leg. At multiple times, Awad told his interrogators that his purpose in traveling to Afghanistan was to receive weapons training and to fight U.S. and allied forces. *See* ISN 88 Knowledgeability Brief (Feb. 6, 2002) ("he went to Afghanistan to become a fighter,"); ISN 88 SIR (July 23, 2005) ("I went there [to Afghanistan] for two reasons: to visit an Islamic nation, and to have weapons training."); ISN 88 SIR (July 8, 2008) (the purpose of his trip was to "relax, gain weapons training and join the fight in Afghanistan.").

The government also introduced into evidence a list of names known as the "Tarnak Farms Document." It is undisputed that Tarnak Farms was an al Qaeda training camp in Afghanistan that provided advanced weapons training to militants. When U.S. and allied forces captured the facility, they found a 100-page undated document. One of the items within the document was a list of names. In the list of names, the name "Abu Waqas" was listed twice, with one of the entries being crossed out. The government alleges that "Abu Waqas" is Awad's *kunya*, his honorific or pseudonym. Along with the list of names, this document also contained: "Notes from a weapons course. Instructions in small arms such as AK47, M16, S.V.D. sniper rifle, rocket launchers such as RPG2, RPG7, HAN, Z.K.I. Notes on aiming and distance calculations. Notes on types of ammunition and its specifications. Instruction from a sniper-training course." Joint Appendix 591-92.

The government also introduced several statements of al Joudi, the other person captured at Mirwais Hospital. On December ■, 2001 (███████████████████), al Joudi gave his interrogators the names and descriptions of the eight al Qaeda fighters he had seen in the Mirwais Hospital. One of the descriptions was of "Abu ((Wakaas)), a 28-year old Yemeni male; had his right leg amputated." Dec. ■, 2001 interrogation report of al Joudi. The government alleges that "Abu (Wakaas))" is another transliteration of Awad's *kunya*. Five of the names provided by al Joudi (including Awad's) match with names on the list in the Tarnak Farms Document.



████████████████████████
████████████████████████
████████████████████████
██████████████████

To further bolster its case, the government introduced into evidence contemporaneous news reports describing what occurred at the Mirwais Hospital. Several of these news reports provided the general background of the siege at the hospital and the events that occurred within. *See* Thomas E. Ricks and Karl Vick, *U.S. Reports Calm in Afghanistan on Christmas Eve; At Kandahar Hospital, Arrest Brings Gunfire*, WASH. POST, Dec. 25, 2001, at A21; Drew Brown, *Armed Patients, Not the Sick, Biggest Concern at Hospital*, MIAMI HERALD, Dec. 26, 2001, at 21A.

Some of the other news articles directly implicate Awad as being part of the al Qaeda force at the hospital. One article described how the al Qaeda fighters "turned over a sick comrade yesterday, saying they could not care for him . . . The fighters surrendered their comrade because they believed his amputated leg had become infected, witnesses said." Drew Brown, *Al-Qaeda Group Holed Up in Hospital; The Seven Wounded Fighters Threatened to Commit Suicide. One Seriously Injured Man was Released.*, PHIL. INQ., Dec. 30, 2001, at A10. The reporter went on to quote an eyewitness to the exchange who described the al Qaeda fighters as saying when handing over the man with the amputated leg: "He is our friend, but we cannot take care of him, so we must turn him over to you, regardless of what you do with him." *Id.* Another news report quoted a doctor who went in to talk to the people behind the barricade. Karl Vick, *For Al Qaeda Patients, Cautious Care; With Grenades Strapped to Their Sides, Injured Fighters Focus Wrath on U.S.*, WASH. POST, Dec. 20, 2001, at A27. The doctor reported that all the people said: "We have just one way, and

that is jihad against America." *Id.*

In support of his petition, Awad introduced into evidence an unsigned "affidavit," a declaration from his counsel, and additional statements he made to his interrogators. Awad argued that he had purposes in going to Afghanistan other than to fight U.S. and allied forces. He contended that while he traveled to Afghanistan to fight, he did not succeed in his goal of joining the fight. He claimed that he was injured by an airstrike while walking through a market in Kandahar, not near the Kandahar airport as the government maintains. Awad asserted that he went to the hospital for care, and in some way ended up behind the barricade. He denied having become "part of" al Qaeda. After making their filings, the parties cross-filed for judgment on the record. The district court held a hearing on the parties' cross-motions on July 31, 2008.

On August 12, 2009, the district court entered a memorandum order denying Awad's petition for a writ of habeas corpus. *Awad v. Obama*, 646 F.Supp.2d 20 (D.D.C. 2009). The district court said that it "formally 'received' all the evidence offered by either side but . . . assessed it item-by-item for consistency, the conditions in which the statements were made and documents found, the personal knowledge of a declarant, and the levels of hearsay." *Id.* at 23. The district court dealt first with the legal issues in the case. It held that the government had the burden of establishing by a preponderance of the evidence the lawfulness of Awad's detention. *Id.* at 23-24. The court also held that the government's authority to continue to detain Awad depended on the continuation of hostilities, not on the individual threat posed by Awad if he were released. *Id.* at 24.

The court then proceeded to its factual analysis. The court found that the reason Awad went to Afghanistan was to "join Al

Qaida to fight against the U.S. after the September 11 attack on the World Trade Center." *Id.* With regard to the Tarnak Farms Document, the court rejected Awad's denial that the name "Abu Waqas" referred to him because he had identified himself with such a name previously. *Id.* But the court found the government's claim that Awad had received training at Tarnak Farms unsupported because "[w]e do not know the purpose of the list or when it was written." *Id.* at 25.

The court made a factual finding that Awad was injured on November 1 or 2, 2001 and went to the hospital shortly thereafter. *Id.* at 26. The court then discussed the remaining evidence. *Id.* at 26-27. ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████The court concluded, based on all these factual findings, that "it appears more likely than not that Awad was, for some period of time, 'part of' al Qaida. At the very least Awad's confessed reasons for traveling to Afghanistan and the correlation of names on a the [sic] list and ████████ clearly tied to al Qaida make it more likely than not that he knew the al Qaida fighters at the hospital and joined them in the barricade." *Id.* The district court denied his petition for a writ of habeas corpus. *Id.* Awad appeals from this adverse judgment.

## II.  ANALYSIS

Awad makes several legal and factual challenges to the district court's decision. Before considering the legal challenges, we will first address Awad's challenges to the factual findings of the district court.

A. Evidentiary Challenges

Awad makes three types of evidentiary arguments. First, he challenges the district court's reliance on certain individual pieces of evidence. Second, he defends two of the district court's factual findings that were favorable to him. Third, he argues that considering all of the evidence before the court, it was clear error to find that he was "part of" al Qaeda through his actions behind the barricade in Mirwais Hospital. We will consider these challenges in turn.

We review a district court's factual findings for clear error, regardless of whether the factual findings were based on live testimony or, as in this case, documentary evidence. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985). "We further note that '[t]his standard applies to the inferences drawn from findings of fact as well as to the findings themselves.'" *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1294 (D.C. Cir. 2010) (*quoting Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983) (alteration in *Overby*). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Boca Investerings Partnership v. U.S.*, 314 F.3d 625, 629-30 (D.C. Cir. 2003) (*quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). But "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Overby*, 595 F.3d at 1294 (*quoting City of Bessemer*, 470 U.S. at 573-74) (omission in *Overby*).

We will begin with Awad's challenges to the individual

items of evidence. In evaluating these challenges, we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole. *Cf. United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) ("[W]e have been mindful of our responsibility to evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the trial record.").

Awad makes a general attack that the district court committed error in relying upon unreliable hearsay evidence. This general attack, however, does not further Awad's case. We have already held that hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable. *See Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010) ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible - it is always admissible - but what probative weight to ascribe to whatever indicia of reliability it exhibits."). The Supreme Court's plurality opinion in *Hamdi*, 542 U.S. at 533-34, expressly states:

> [T]he exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding.

Thus, the fact that the district court generally relied on items of evidence that contained hearsay is of no consequence. To show error in the court's reliance on hearsay evidence, the habeas petitioner must establish not that it is hearsay, but that it is unreliable hearsay. This Awad has not done.

The district court relied upon the Tarnak Farms Document

to corroborate the statements of al Joudi and ██████████████.
Awad alleges it was error for the district court to use the Tarnak
Farms Document for any purpose, as it had previously refused
to rely on the Tarnak Farms Document to show that Awad
trained at Tarnak Farms.  Awad misreads the district court's
opinion.  The district court did not hold that the Tarnak Farms
Document was useless or unreliable.  The district court only
found that the document was not necessarily a list of trainees, so
it could not substantiate a finding that Awad trained at Tarnak
Farms.  646 F.Supp.2d at 25.  But such a finding does not
preclude the district court from using the document for other
purposes.  Even though the district judge did not know what the
purpose of the list of names was, he knew that it was a list found
in an al Qaeda document discovered at a terrorist training camp
that contained two listings of Awad's *kunya*.  Awad does not
challenge the district court's factual finding that the references
in the document are to him.  The district court took the Tarnak
Farms Document, considered the circumstances of the
document, and weighted it accordingly in its analyses of the
various questions with which it was presented.  It was not error
for the district court to find the document relevant on some
issues, but not others.

Awad attacks the district court's reliance on statements of
al Joudi.  Awad asserts that the government assessed al Joudi
was lying when he denied his own involvement in al Qaeda, and
therefore, none of his statements should be believed.  But al
Joudi made two types of statements: he made statements
exculpating himself and statements incriminating others.  The
government interrogators noted disbelief of al Joudi's
exculpatory statements, but made no such notations as to al
Joudi's statements incriminating others.  Awad argues that since
the government assessed al Joudi to be a liar on one topic
(whether he was part of al Qaeda), it was clear error to rely on
his statements about different topics (whether others were part

of al Qaeda).

Such an argument is contrary to long established analysis of witness testimony. It is a standard jury instruction that a juror can choose to believe all of what a witness says, some of what a witness says, or none of what a witness says. *See U.S. v. Glover*, 731 F.2d 41, 44 n. 6 (D.C. Cir. 1984) ("You are the sole judge of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and the extent to which any witness should be believed.") (quoting Criminal Jury Instructions for the District of Columbia, Instruction 2.11). In al Joudi's case, it accords with common sense that he may have had a motivation to lie about his own involvement in nefarious activity but not have the same motivation to lie about the involvement of another.

Of course, the fact that a witness may have lied on one topic may be considered in determining the credibility of his statements about other matters. But that assessment, that weighing, is for the finder of fact. Our review of the fact finder's decision to credit some of the statements of an individual but not others is reviewed for clear error. Awad makes no showing that the district court committed clear error in crediting al Joudi's statements identifying the al Qaeda fighters inside the hospital.

Awad attacks the district court's reliance on correlation of names among the al Joudi list, the Tarnak Farms Document, and ███████████ because the names in the various lists do not match perfectly. But the government need not, and does not, assert that there is perfect correlation. Rather, the government asserts just what the district court found: the correlation of names on the lists is too great to be mere coincidence. There is no requirement of 100% overlap for one document to corroborate another. The listing of identical names in the

███████ and in al Joudi's list indicates that al Joudi's statements identifying the other al Qaeda fighters were reliable. The district court did not err in finding that the correlation among names in the four lists lent credibility to al Joudi's statements identifying the al Qaeda fighters.

Awad defends two favorable factual findings of the district court: that Awad did not train at Tarnak Farms and that Awad arrived at Mirwais Hospital one month before the al Qaeda fighters arrived. The first argument is not relevant to our review; the government is not challenging the district court's factual finding that Awad did not train at Tarnak Farms and is not placing any reliance upon any such training for its authority to continue to detain Awad pursuant to the AUMF.

As to the second argument, regarding when Awad arrived at the hospital, the district court found that Awad arrived at the hospital on or about November 1, 2001. 646 F.Supp.2d at 26. The government argues that this factual finding was clearly erroneous and that he arrived in the first week of December along with the group of al Qaeda fighters who created the barricade. We need not decide this issue, as it does not affect the outcome of the case. The government's evidence that Awad was "part of" al Qaeda does not depend on when Awad arrived at the hospital. Rather, the factual assertion is simply that when the al Qaeda fighters took over part of Mirwais Hospital, Awad joined them behind the barricade. The truth of that assertion is unrelated to his arrival date. It is immaterial whether Awad had already been at the hospital for a month, a week, or a day. This factual issue is irrelevant to whether Awad was "part of" al Qaeda. None of Awad's evidentiary arguments demonstrate clear error by the district court.

We next consider whether the district court, in light of *all* of the evidence, made an erroneous finding that Awad was "part

of" al Qaeda. Reviewing all the evidence, it is plain that the district court made no error in its ultimate conclusion. Awad's statements of intent are undisputed. Awad repeatedly told U.S. interrogators that the reason he traveled to Afghanistan in mid-September 2001 was to join the fight against U.S. and allied forces. The district court found that the reason Awad traveled to Afghanistan was to fight, and Awad does not challenge that finding on appeal. The government acknowledges that intention to fight is inadequate by itself to make someone "part of" al Qaeda, but it is nonetheless compelling evidence when, as here, it accompanies additional evidence of conduct consistent with an effectuation of that intent.[1]

Other unchallenged evidence includes Awad's concession that he "was surrendered by the insurgents and detained by Afghan forces at Mirwais Hospital on December ■, 2001 . . . ." Appellant's Br. 5. The further evidence of the events at the hospital underscores how incriminating this concession is. A group of al Qaeda fighters took over part of the Mirwais Hospital. The part of the hospital not under al Qaeda control continued functioning and treating patients. Awad admits that he was "surrendered by the insurgents." This supports the district court's understanding that Awad was behind the al Qaeda barricade at the Mirwais Hospital. If Awad had not been behind the barricade with the al Qaeda fighters, he could not have been "surrendered" to U.S. allied forces. Awad could simply have left. But, as he tells us, he was surrendered by al Qaeda forces. The district court could properly find that Awad was behind the barricade with the al Qaeda fighters.

The district court also had before it evidence identifying

---

[1] Of course, the AUMF grants authority to the President to detain individuals for reasons other than for being members of al Qaeda or the Taliban.

Awad as one of the al Qaeda fighters. The statements of al Joudi identified Awad as being one of the al Qaeda fighters. This identification even specifically identified that Awad had an amputated leg. The ▮▮▮▮▮▮▮▮ corroborates this identification because of the overlap of names.

Both the ▮▮▮▮▮▮▮▮ and the Tarnak Farms Document include names used by Awad. Awad does not challenge the district court's factual finding that he used those names on appeal. While the appearance of his name on al Qaeda documents may not, by itself, be adequate to support a factual finding that he was "part of" al Qaeda, it certainly provides support for the district court's overall factual conclusion that Awad was "part of" al Qaeda.

The court also had before it multiple news reports. These accounts support the finding that Awad was one of the al Qaeda fighters. While the news reports are hearsay, the district court could properly treat them as reliable. The reports were written contemporaneously with the events that occurred. The reporters who wrote the articles in December of 2001 had no reason to even imagine that the events occurring at the hospital would eventually be at issue in a court of law of the United States. They had no reason to falsify their reports. The information in the reports is hearsay, but as we discussed above, hearsay may be relied upon in this type of proceeding if the district court has reason to believe that the hearsay is reliable.

To summarize, the evidence before the district court was that: Awad traveled to Afghanistan for the purpose of fighting against U.S. and allied forces; he was with the al Qaeda fighters behind the barricade in the hospital; he was surrendered by the al Qaeda fighters; al Joudi, who was there, identified him as being one of the al Qaeda fighters; al Joudi's statements were corroborated by documentary evidence; and Awad's name

appeared in two highly relevant pieces of documentary evidence. Additionally, contemporaneous newspaper reports identified Awad as one of the al Qaeda fighters. Against this evidence, the district court had only Awad's self-serving statements of innocence, which the district court, as finder of fact, did not credit.

Determining whether Awad is "part of" al Qaeda is a mixed question of law and fact. Whether our review of the district court's finding on this question is *de novo* or for clear error does not matter in this case because the evidence is so strong. Simply recounting the evidence establishes that under either standard of review, the district court's conclusion that Awad was "part of" al Qaeda was not erroneous. Awad has not come close to meeting his burden of showing reversible error in the district court's finding that Awad was "part of" al Qaeda at Mirwais Hospital during December 2001.

### B. Legal Challenges

Awad challenges three of the district court's legal holdings. These we review *de novo*. *See Al-Bihani*, 590 F.3d at 870. First, Awad challenges the district court's holding that the government must prove its authority to continue to detain him by a preponderance of the evidence. He argues that the government has to meet its burden by clear and convincing evidence. He is incorrect. We have already explicitly held that a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay, Cuba. *See Al-Bihani*, 590 F.3d at 878 ("Our narrow charge is to determine whether a preponderance standard is unconstitutional. Absent more specific and relevant guidance, we find no indication that it is.").

The *Al-Bihani* holding follows the Supreme Court's

guidance to lower courts in the *Hamdi* plurality. *See Hamdi*, 542 U.S. at 534 ("Thus, once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria. A burden-shifting scheme of this sort would meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant."). Our precedent in *Al-Bihani* is clear, and "[w]e, of course, are without authority to overturn a decision by a prior panel of this Court." *Louisiana Public Service Comm'n v. FERC*, 522 F.3d 378, 390 (D.C. Cir. 2008). Awad seems to argue that there is some uncertainty in the evidentiary standard. Lest there be any further misunderstandings, let us be absolutely clear. A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF.[2]

Awad next argues that the district court erred in denying his petition without a specific factual finding that Awad would pose a threat to the Untied States and its allies if he were released. Again, *Al-Bihani* forecloses this argument. *Al-Bihani* makes plain that the United States's authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities. 590 F.3d at 874. Awad again attempts to insert uncertainty into this court's prior holding where there is none. Whether a detainee would pose a

---

[2] Like the *Al-Bihani* court, 590 F.3d at 878 n. 4, we note that our analysis here does not establish that preponderance of the evidence is the constitutionally-required minimum evidentiary standard.

threat to U.S. interests if released is not at issue in habeas corpus proceedings in federal courts concerning aliens detained under the authority conferred by the AUMF.

Awad's last challenge is that it is not enough that he was found to be "part of" al Qaeda. He argues that there must be a specific factual finding that he was part of the "command structure" of al Qaeda. There is no such requirement under the AUMF. *See* AUMF ("That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons."). Nowhere in the AUMF is there a mention of command structure.

The distinction here is between defining what is necessary and what is sufficient. If the government can establish by a preponderance of the evidence that a detainee was part of the "command structure" of al Qaeda, this satisfies the requirement to show that he was "part of" al Qaeda. But there are ways other than making a "command structure" showing to prove that a detainee is "part of" al Qaeda. For example, if a group of individuals were captured who were shooting at U.S. forces in Afghanistan, and they identified themselves as being members of al Qaeda, it would be immaterial to the government's authority to detain these people whether they were part of the "command structure" of al Qaeda. Once Awad was "part of" al Qaeda by joining the al Qaeda fighters behind the barricade at the hospital, the requirements of the AUMF were satisfied. *See Al-Bihani*, 590 F.3d at 872 (holding that under the AUMF, a person may be lawfully detained if, *inter alia*, he was "part of" al Qaeda forces). Awad points us to no authority from this court

or the Supreme Court that would counsel a different decision.

III. CONCLUSION

The federal judiciary now has the duty of evaluating the United States military's detention of those it deems part of enemy forces. Because of the unique nature of the conflict in which the United States is now involved, the Supreme Court has recognized that we may need to alter or amend our normal procedures to accommodate the important national security and practical concerns created by bringing these cases before Article III courts. In some cases district courts have ordered detainees released for lack of evidence, but this is not such a case. Awad admits that the reason he traveled to Afghanistan was to join the fight against U.S. and allied forces. He then succeeded in that goal by joining a group of al Qaeda fighters who took over part of a hospital and barricaded themselves therein. We also reject Awad's legal challenges. Prior decisions of this court clearly hold that a preponderance of the evidence standard is constitutional and that there is no requirement that the government must show that a detainee would be a threat if released in order to detain him. Further, Awad points us to no legal authority for the proposition that he must be a part of al Qaeda's "command structure" to be detained. Accordingly, we affirm the district court's denial of his petition for a writ of habeas corpus.

*So ordered.*