# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 20, 2010          Decided June 11, 2010

No. 09-5383

SUFYIAN BARHOUMI, DETAINEE,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01506-RMC)

———

Scott S. Barker argued the cause for appellant. With him on the briefs were Jonathan S. Bender, Danielle R. Voorhees, and Shayana Kadidal.

Sharon Swingle, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were Ian Heath Gershengorn, Deputy Assistant Attorney General, and Robert M. Loeb, Attorney. Jonathan H. Levy, Attorney, entered an appearance.

Before: GINSBURG, TATEL, and KAVANAUGH, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Sufyian Barhoumi, a detainee held at the U.S. naval base in Guantanamo Bay, Cuba, appeals the district court's denial of his petition for a writ of habeas corpus. The district court found that Barhoumi was "part of" an al-Qaida-associated force engaged in hostilities against the United States or its coalition partners and was therefore lawfully detained under the Authorization for Use of Military Force. Barhoumi contends that the court erred as a matter of law in admitting hearsay diary evidence and in applying a preponderance of the evidence standard of proof. These arguments, however, are foreclosed by prior decisions of this court. Barhoumi further argues that even if the diary evidence was admissible, the district court erred in relying on it and in concluding that the evidence showed that he was "part of" an associated force. Finding no reversible error, we affirm.

## I.

In response to the September 11, 2001, terrorist attacks on the Pentagon and World Trade Center, Congress enacted a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" or "harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note). Shortly thereafter, the President ordered U.S. military forces to invade Afghanistan, where the Taliban regime had been harboring al-Qaida.

This case concerns Sufyian Barhoumi, who was captured during the ensuing hostilities and has, pursuant to the AUMF, been held at the U.S. naval base in Guantanamo Bay, Cuba, for the last eight years. A 37-year-old Algerian citizen, Barhoumi left Algeria after completing high school and travelled throughout northern Africa and Europe, ultimately settling in London, where he lived for about two years. At his Combatant Status Review Tribunal (CSRT) and Administrative Review Board (ARB) hearings, Barhoumi recounted that while in London he attended a mosque where he saw films depicting Russian atrocities committed against Muslims in Chechnya. Inspired by these films, Barhoumi travelled to Karachi, Pakistan, and then to Jalalabad, Afghanistan, where he trained to fight alongside the Chechens in their struggle against the Russian government.

By his own admission, Barhoumi trained at several military camps in Afghanistan. In 1999, he trained at a camp located between Jalalabad and Kabul, where he received instruction in the use of rifles, small arms, and landmines. While practicing mine diffusion, he lost four fingers and badly damaged his thumb when a landmine he had unearthed exploded in his left hand. After recovering from his injuries, Barhoumi trained at another camp, Khaldan, from 1999 to 2000. Located in the Khowst region of eastern Afghanistan, the Khaldan camp was associated with Abu Zubaydah, a reputed terrorist leader who commanded his own fighting force and who figures prominently in this case. Although the Khaldan camp was not an al-Qaida facility, a government intelligence report states that Zubaydah had agreed with Usama bin Laden to coordinate training efforts and allow Khaldan recruits to join al-Qaida. According to the report,

At the Khaldan camp, Barhoumi received additional small arms training, as well as instruction in tactical movement, navigation, artillery, mortars, radio communication, and military tactics used in Chechnya. Barhoumi left Khaldan in May 2000, but unable to make it to Chechnya—crossing the border apparently proved too dangerous—Barhoumi shuttled between a series of guesthouses in Kabul, Khandahar, and Jalalabad. Although the government claims he provided military training to others at these guesthouses, Barhoumi denied doing so, insisting that he spent this time teaching children the Koran and Arabic. Barhoumi admitted that he received additional antipersonnel mine instruction at another training camp during this period, though he later backtracked, claiming that he trained at only two military camps in Afghanistan, not three.

After U.S. and coalition forces commenced military action in Afghanistan, Barhoumi decided to leave the country. At some point in late fall of 2001 (the precise timing is disputed), Barhoumi fled Afghanistan through the mountains into Pakistan, initially staying at a guesthouse in Waziristan, the mountainous region along the border, and then moving on to various guesthouses in Peshawar and Lahore. In his ARB hearing, Barhoumi testified that he travelled to a guesthouse in Faisalabad, Pakistan, in February 2002. Approximately ten days after he arrived there, Pakistani police officers raided the house and arrested him—along with Abu Zubaydah, who was also staying at the Faisalabad guesthouse. In May 2002, the U.S. military took Barhoumi into custody and transferred him to Guantanamo, where he has been detained ever since. Abu Zubaydah is also being held at the Guantanamo naval base.

In July 2005, Barhoumi filed a petition for a writ of habeas corpus in the U.S. District Court for the District of Columbia. Although the district court granted the government's motion to dismiss on the ground that section 7 of the Military Commissions Act of 2006 (MCA), 28 U.S.C. §

2241(e), deprived the court of jurisdiction over habeas claims brought by aliens detained as enemy combatants, it later vacated that dismissal in light of the Supreme Court's decision in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008). There the Supreme Court held that the constitutional privilege of habeas corpus extends to aliens detained at Guantanamo and struck down the MCA's jurisdiction-stripping provision as an unconstitutional suspension of the writ.

Following *Boumediene*, the judges of the district court, meeting in executive session, decided to coordinate proceedings in most Guantanamo habeas cases, including Barhoumi's. *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (D.D.C. July 2, 2008). On November 6, 2008, Judge Hogan, the coordinating judge, issued a Case Management Order governing the consolidated proceedings. *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, 2008 WL 4858241 (D.D.C. Nov. 6, 2008) ("CMO"). The CMO provided, among other things, that (1) individual judges hearing habeas corpus petitions may admit and consider hearsay evidence, and (2) the government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful. *Id.*, 2008 WL 4858241 at *3.

Ruling from the bench, the district judge hearing Barhoumi's petition explained that the AUMF authorized the President "to detain persons who were part of[,] or substantially supported, Taliban or al Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported hostilities in aid of such enemy armed forces." Hr'g Tr. at 4, *Barhoumi v. Obama*, No. 05-1506 (D.D.C. Sept. 3, 2009). Applying this standard, the court concluded that Barhoumi was properly detained and therefore denied his habeas petition.

In reaching this conclusion, the district court relied on Barhoumi's own testimony in the CSRT and ARB proceedings, as well as on two diaries recovered at the ███████████████████████████████. The first of these diaries was authored by ███████████. The second was written by one Abu Kamil al-Suri, who claimed in his diary to be a member of Zubaydah's militia. Although the record does not contain the al-Suri diary itself, it does contain an intelligence report that includes an English translation of the diary. In his diary, al-Suri described staying in a guesthouse in Pakistan along with Zubaydah and a person identified as "Ubaydah Al-Jaza'iri," which the district court concluded referred to Barhoumi, who had admitted to using that alias. The court observed that "the travel pattern of Mr. Barhoumi[,] as he describes it, is consistent with the travel pattern of Mr. Zubaydah and Mr. al Suri," as described in the ████████ and al-Suri diaries: "each of them started in Afghanistan, crossed mountains into Pakistan, moved through Pakistan, went to Lahore and ended up in Faisalabad where they were arrested together." *Id.* at 5.

The district court also relied on the two diaries' descriptions of fighting at Tora Bora, the cave complex in the mountains of eastern Afghanistan where Taliban and al-Qaida fighters—reportedly including bin Laden—holed up after the commencement of hostilities and were besieged by U.S. and coalition forces. According to ████████'s diary, after the beginning of the war Zubaydah fled to Waziristan to help fighters escape from Tora Bora. Al-Suri recounts in his diary that "[i]n the evening, 'Ubaydah Al-Jaza'iri, one of the trainers at Khaldun[,] came in from Tora Bora" and reported that "300 of the brothers were gathered" there. ████████'s diary similarly refers to "one of our brothers who came from (Tora Bora)" and who reported that "300 brothers" fought there. Given the consistency of these diary entries, the district court determined that Barhoumi was in fact the person

referred to in both diaries as coming from Tora Bora to the Pakistan guesthouse where Zubaydah was staying.

Based on all this evidence, the district court concluded that Barhoumi was "part of" Zubaydah's militia—an "associated force that was engaged in hostilities against the United States or its coalition partners"—and therefore lawfully detained pursuant to the AUMF. Hr'g Tr. at 12. Barhoumi now appeals the district court's denial of his habeas petition. In considering this appeal, we have benefitted from the superb briefs and excellent oral argument by counsel for both parties.

## II.

We begin with two threshold legal issues. Barhoumi argues that the district court erred in admitting into evidence the al-Suri and ▌▌▌▌ diaries, which are hearsay. *See* FED. R. EVID. 801(c). He further argues that the district court should have applied a clear and convincing evidence standard of proof rather than a preponderance standard. We consider each issue in turn.

### *The Diaries*

Barhoumi contends that in admitting the diaries, the district court adjudicating his habeas petition failed to comply with the CMO, which set forth the following procedures regarding the admission of hearsay evidence:

> On motion of either the petitioner or the government, the Merits Judge may admit and consider hearsay evidence that is material and relevant to the legality of the petitioner's detention if the movant establishes that the hearsay evidence is reliable and that the provision of nonhearsay evidence would unduly burden the movant or interfere with the

> government's efforts to protect national security.
> The proponent of hearsay evidence shall move for
> admission of the evidence no later than 7 days prior
> to the date on which the initial briefs for judgment
> on the record are due.

CMO, 2008 WL 4858241 at *3 (internal citation omitted).
Barhoumi points out that the government never timely filed a
motion specifically requesting admission of the diaries, as
required by the CMO. Rather, the government submitted a
memorandum in which it made general assertions regarding
the admission and reliability of hearsay evidence in all the
Guantanamo detainee cases, but made no mention of the
diaries or any other evidence in specific connection to
Barhoumi's factual return. Later, after the deadline
established in the CMO had passed, the government filed a
motion in Barhoumi's case to supplement the record with the
diaries. The district court admitted all the hearsay evidence,
including the two diaries, explaining:

> Because these Guantanamo proceedings are unique
> and difficult, I have decided to receive and consider
> all of the evidence offered by both sides, but have
> assessed it item by item for consistency[,] the
> conditions in which the statements were made and
> the documents found. The personal knowledge of
> the declarant and the levels of hearsay. I have given
> the evidence the weight I think it deserves.

Hr'g Tr. at 4.

Barhoumi argues that the district court's decision
violated the CMO not only because the government failed to
timely move to admit the diary evidence (according to
Barhoumi, the generic hearsay memorandum, though timely,
failed to qualify as a motion to admit the diaries), but also
because the government never demonstrated that "the

provision of nonhearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security," as the CMO required. CMO, 2008 WL 4858241 at *3. Quoting the Federal Circuit, Barhoumi states that "parties must understand that they will pay a price for failure to comply strictly with scheduling and other orders, and that failure to do so may properly support severe sanctions and exclusions of evidence." Appellant's Br. 20 (quoting *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006)) (internal quotation marks omitted); *see also Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998) ("[L]itigants have an unflagging duty to comply with clearly communicated case-management orders."). Given this, Barhoumi argues, the district court's alleged failure to comply with the CMO in and of itself constitutes grounds for reversal. We disagree.

Although the cases Barhoumi cites hold that *parties* have a duty to comply with case management orders, he cites no authority for the proposition that *judges* are required to follow their own—much less another judge's—case management order. In any event, the CMO governing the Guantanamo habeas cases expressly authorizes judges assigned to adjudicate habeas petitions to "alter the framework [set out in the CMO] based on the particular facts and circumstances of their individual cases." CMO, 2008 WL 4858241 at *1 n.1. That is precisely what the district court did here. Citing the "unique and difficult" circumstances inherent in the Guantanamo proceedings, the district court decided—after giving Barhoumi an opportunity to respond to the government's motion to supplement the record—that the circumstances of Barhoumi's case justified admitting all hearsay evidence. Hr'g Tr. at 4. Other district judges have made the same determination in similar circumstances. *See, e.g., Awad v. Obama*, 646 F. Supp. 2d 20, 23 (D.D.C. 2009) (receiving all evidence offered by either side but assessing it "item-by-item for consistency, the conditions in which

statements were made and documents found, the personal knowledge of a declarant, and the levels of hearsay"). We therefore conclude that the district court did not abuse its discretion in departing from the CMO's procedural framework regarding the admissibility of hearsay. *See Potter v. District of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009) (case management decisions reviewed for abuse of discretion).

Barhoumi next contends that irrespective of the district court's fidelity to the CMO, the court erred in admitting the diaries absent a demonstration by the government that they fall within an established hearsay exception in the Federal Rules of Evidence. This argument, however, runs counter to this court's decision in *Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010), another Guantanamo habeas case in which the detainee also challenged the district court's admission of hearsay evidence. Relying in part on the Supreme Court's suggestion in *Hamdi v. Rumsfeld*, 542 U.S. 507, 533–34 (2004), that hearsay "may need to be accepted as the most reliable available evidence" in enemy combatant proceedings, the court stated that "the question a habeas court must ask when presented with hearsay is not whether it is admissible— *it is always admissible*—but what probative weight to ascribe to whatever indicia of reliability it exhibits," *Al-Bihani*, 590 F.3d at 879 (emphasis added).

Barhoumi seeks to sidestep this language by characterizing it as mere dicta that is "neither binding nor persuasive." Appellant's Br. 20. Since oral argument in this case, however, another panel of this court has squarely foreclosed his theory. In *Awad v. Obama*, No. 09-5351 (D.C. Cir. June 2, 2010), the panel explained that *Al-Bihani* stands for the proposition that "hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable." *Id.*, slip op. at 11. "We, of course, are without authority to overturn a decision by a prior panel of this Court." *La. Pub. Serv.*

*Comm'n v. FERC*, 522 F.3d 378, 390 (D.C. Cir. 2008). Thus, to show that the district court erred in considering the diary evidence, Barhoumi must "establish not that it is hearsay, but that it is unreliable hearsay"—a question that we address in Part III, below. *Awad*, slip op. at 11.

### Preponderance of the Evidence

In *Boumediene*, the Supreme Court stated that the "extent of the showing required of the Government in these [Guantanamo habeas] cases is a matter to be determined." 128 S. Ct. at 2271. Filling that void, the CMO provides that the "government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." CMO, 2008 WL 4858241 at *3. Barhoumi challenges the district court's use of this standard, arguing that the "Government should have been required to establish that Barhoumi is lawfully detained under a standard of at least clear and convincing evidence." Appellant's Br. 32–33.

This argument is also foreclosed by circuit precedent. In *Al-Bihani*, the detainee similarly argued for "at least" a clear and convincing evidence standard, while the government argued for a preponderance standard. *Al-Bihani*, 590 F.3d at 878. We concluded that "the government's argument stands on more solid ground," stating: "Our narrow charge is to determine whether a preponderance standard is unconstitutional. Absent more specific and relevant guidance, we find no indication that it is." *Id.*

Barhoumi attempts to recast this language as mere dicta, but again, that argument is barred by *Awad*. There the panel interpreted *Al-Bihani* as holding that "a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay, Cuba." *Awad*, slip op. at 17. That resolves the question here as well.

## III.

This brings us to Barhoumi's factual challenge. He argues that even if the diaries are admissible hearsay, the district court should have disregarded them on the ground that they are inherently unreliable. He further asserts that the government failed to establish that he was "part of" an associated force and that the district court therefore erred in denying his habeas petition. In resolving these claims, our job is aided considerably by several key points of agreement that serve to narrow the issue before us.

To begin with, as Barhoumi's counsel acknowledged at oral argument, Barhoumi does not challenge the detention standard advanced by the government and adopted by the district court: the President has authority, pursuant to the AUMF, "to detain persons who were part of[,] or substantially supported, Taliban or al Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported hostilities in aid of such enemy armed forces." Hr'g Tr. at 4. Nor does Barhoumi dispute that Zubaydah's militia qualifies as an "associated force" that engaged in hostilities against U.S. or coalition forces. The only dispute, then, is whether Barhoumi was, as the district court found, "part of" Zubaydah's organization.

The parties also agree on our standard of review. "We review the district court's findings of fact for clear error, its habeas determination *de novo*, and any challenged evidentiary rulings for abuse of discretion." *Al-Bihani*, 590 F.3d at 870 (internal citations omitted). Determining whether a detainee was "part of" an associated force is a mixed question of law and fact. *Awad*, slip op. at 17. That is, whether a detainee's alleged conduct—e.g., visiting an al-Qaida guesthouse or training at an al-Qaida camp—justifies his detention under the

AUMF is a legal question. *Cf. Al-Bihani*, 590 F.3d at 873 n.2. The question whether the government has proven that conduct—e.g., whether he in fact stayed at an al-Qaida guesthouse or trained at an al-Qaida camp—is a factual question that we review for clear error.

When reviewing for clear error, we may not reverse a trial court's factual findings "even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). Rather, we ask whether, "on the entire evidence," we are "left with the definite and firm conviction that a mistake has been committed." *Id.* at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotation marks omitted). We apply this deferential standard, moreover, "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* at 574. In evaluating a challenge to a district court's factual findings, "we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole." *Awad*, slip op. at 11. Equally well settled, the preponderance of the evidence standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [she] may find in favor of the party who has the burden." *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993) (internal quotation marks omitted).

Given this common ground, the ultimate and relatively narrow question we must answer here is this: did the district court commit reversible error in finding that it is more likely than not that Barhoumi was "part of" Zubaydah's associated force? To answer that question, we first address the evidence advanced by the government in support of Barhoumi's detention. As we shall explain, that evidence is sufficient to sustain the district court's decision, provided—and this is the

central issue in this case—that the al-Suri diary is sufficiently reliable. Applying the reliability requirement set forth by this court in *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), we conclude that the district court did not clearly err in relying on the diary.

### Evidence Supporting Barhoumi's Detention

In support of his challenge to the district court's determination that the evidence showed that he was "part of" an associated force, Barhoumi argues that the district court improperly relied on a "guilt-by-association theory" predicated on its observation that "the travel pattern of Mr. Barhoumi as he describes it, is consistent with the travel pattern of Mr. Zubaydah and Mr. al Suri." Appellant's Br. 37; Hr'g Tr. at 5. Membership in an "associated force," Barhoumi argues, cannot be established by "evidence that the person's movements and activities were similar to the movements of individuals who are known to be affiliated with al-Qaida or Taliban forces." Reply Br. 15 (quoting Appellees' Br. 30) (internal quotation marks omitted). Likewise, Barhoumi asserts, "mere sympathy for or association with an enemy organization does not render an individual a member" of that associated force. Appellant's Br. 36 (quoting *Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 (D.D.C. 2009)) (internal quotation marks omitted). Rather, the "key inquiry" is "whether the individual functions and participates within or under the command structure of the organization—*i.e.*, whether he receives and executes orders or directions." *Id.* (quoting *Hamlily*, 616 F. Supp. 2d at 75) (internal quotation marks omitted). According to Barhoumi, the record is devoid of any evidence that Barhoumi "was a member of Zubaydah's purported 'army,' much less within the command structure," or that he "received or executed any orders from Zubaydah, al-Suri or any other 'member' of Zubaydah's army." *Id.* at 37.

Although this court has yet to delineate the precise contours of the "part of" inquiry—a legal issue—we need not do so here because we conclude that even under the test espoused by Barhoumi, the district court committed no error in determining that it is more likely than not that he was "part of" Zubaydah's militia. *Cf. Awad*, slip op. at 19 (noting that the AUMF contains no requirement that a detainee be "part of" the "command structure" of al-Qaida). That is because in focusing exclusively on the travel pattern evidence, Barhoumi ignores other probative evidence put forth by the government that supports the district court's finding that he was "part of" Zubaydah's organization.

To begin with, Barhoumi was captured along with Zubaydah at the Faisalabad guesthouse, a fact he acknowledges. Barhoumi also acknowledges that he trained at the Khaldan camp, though at oral argument Barhoumi's counsel challenged the government's claim that the Khaldan camp was linked to Zubaydah. The sole support for that connection, according to counsel, is a "Background Declaration" prepared by a senior intelligence analyst from the Defense Intelligence Agency regarding "Terrorist Training Camps." This declaration, prepared on September 19, 2008, for use in "federal court litigation," provides an overview of alleged training camps in Afghanistan and states that "[w]hile the Khaldan camp was not an al-Qaida facility, Abu Zubaydah had an agreement with bin Ladin to conduct reciprocal recruiting efforts whereby promising trainees at the Khaldan camp . . . could join al-Qaida if desired." According to Barhoumi's counsel, this declaration suffers from the same defect as did the intelligence reports deemed unreliable in *Parhat*, namely that "there's no information contained in that paragraph from which the court can assess the reliability of the information contained in the document." Oral Arg. Tr. at 9.

We shall have more to say about *Parhat* shortly. For now, however, it suffices to point out that, contrary to counsel's argument, the government did put forth additional record evidence in support of its assertion regarding Zubaydah's role at the Khaldan camp. Specifically, an FBI report prepared in May 2001 describes interrogation statements made by Ahmed Ressam, a Khaldan trainee who was subsequently convicted in federal district court for his role in the "Millennium" plot to detonate explosives at Los Angeles International Airport on December 31, 1999. *See generally United States v. Ressam*, 593 F.3d 1095 (9th Cir. 2010) (describing circumstances of Ressam's conviction). Ressam told his interrogators that ███████ was "the overall leader of Khalden and Deronta Camps" and that there "is no one to whom ███████ must report in terms of a superior." He further described ███████ as "an associate of [Usama bin Laden]" who "coordinates and cooperates with [bin Laden] in the conduct of training and trainee movements between ███████ camps and [bin Laden] camps." Consistent with this report, Ressam later testified in the federal trial of an alleged coconspirator in the Millennium bomb plot that Zubaydah is "the person in charge" of the Khaldan camp and who "takes care of the expenses of the camps" under his authority. Trial Tr. at 547, *United States v. Haouari*, No. 00-15 (S.D.N.Y. July 3, 2001). Thus, unlike the "bare assertions" at issue in *Parhat*, 532 F.3d at 847, the government's assertion here that Zubaydah ran the Khaldan camp is backed up by testimony from a self-professed Khaldan trainee who, in proceedings having nothing to do with Barhoumi and which predated the September 11, 2001, attacks, attested to Zubaydah's connection to Khaldan.

Barhoumi's exclusive focus on the sufficiency of the travel pattern evidence also overlooks what is perhaps the most probative record evidence that he was in fact "part of" Zubaydah's associated force. On the last page of his diary, al-Suri lists fifteen members of Zubaydah's militia and

describes each person's role in the group. The relevant portion of this passage reads as follows:

> Sayf Al-'Adil and Abu Muhammad Al-Masri and those with them are trying to take over this group, especially Tariq, and benefit from us and lead us to join Shaykh 'Usama Bin Laden. Tariq told me that if anything happened to him, we should join Sayf Al-'Adil to be under his wing and that of Al-Qa'ida.
>
> The Group is:
>
> 1- Tariq: Abu Zubaydah Al-Filastini: The commander
>
> 2- Myself, Abu Kamil Al-Suri: Permanent
>
> \*\*\*
>
> 8- 'Ubaydah Al-Jaza'iri: Permanent
>
> \*\*\*
>
> 12- 'Abdullah Al Muslim . . . . Hatib and 'Abdullah are undergoing training at this time on electronics by 'Ubaydah Al-Jaza'iri and will leave us to go inside (Afghanistan) and to work with explosives and electronic[s] . . . for the brothers inside. The brothers will depend on both of them in the future for operations against the Americans inside of Afghanistan, God is willing.

"Tariq" is the name al-Suri uses to refer to Zubaydah throughout the diary, and, as noted above, the district court found that "Ubaydah Al-Jaza'iri" refers to Barhoumi. Thus, contrary to Barhoumi's assertion that the government failed to put forth *"any"* evidence that he "was a member of Zubaydah's purported 'army,'" Appellant's Br. 37, the al-Suri diary—a veritable membership list—expressly states that Barhoumi (referred to by his alias Ubaydah al-Jaza'iri) was a "Permanent" member of Zubaydah's militia and that he was

providing explosives training to other members intending to fight U.S. forces in Afghanistan.

Dismissing this portion of the diary as merely aspirational, Barhoumi's counsel stated, "if you look at that diary entry, that was a hypothetical about what might happen in the future. It wasn't a description of a present fact." Oral Argument Tr. at 76–77. True, several portions of the excerpt reflect future intent—for example, al-Suri's statement that the two militia members trained by Barhoumi "will leave us" to use explosives against Americans operating in Afghanistan. The rest of the passage, however, speaks to the present. It reports that "[t]he Group *is*" made up of the identified members, including Ubaydah al-Jaza'iri, who is described as a "Permanent" militia member. (Emphasis added.) And it states that "Hatib and 'Abdullah *are* undergoing training *at this time* on electronics by 'Ubaydah Al-Jaza'iri." (Emphasis added.) Far from a mere "prediction about what might happen in the future," Oral Arg. Tr. at 77, this portion of al-Suri's diary describes the status of Zubaydah's group as it then existed.

Counsel further insisted that the al-Suri diary "arguably doesn't mention our client" at all, and that the "Ubaydah Al-Jaza'iri," referred to as a "Permanent" member of Zubaydah's group, is "not necessarily our client." Oral Arg. Tr. at 15. Although Barhoumi never squarely presses this argument in his appellate briefs, we think the issue, critical as it is, merits our full consideration.

There is no doubt that Barhoumi went by the alias Ubaydah al-Jaza'iri, which in Arabic means Ubaydah "the Algerian." Barhoumi concedes as much. In his district court filings, Barhoumi, who is in fact Algerian, referred to himself as "Sufyian Barhoumi, a/k/a Abu Obaida, Ubaydah al Jaza'iri, and Shafiq," Pet'r's Pub. Traverse to the Gov's Return to the Pet. for Habeas Corpus at 2, *Barhoumi v.*

*Obama*, Misc. No. 05-1506 (D.D.C. Feb. 13, 2009), and Barhoumi told his interrogators that he was known as Ubaydah when staying at various guesthouses in Afghanistan and Pakistan. The only question, then, is whether the "Ubaydah Al-Jaza'iri" referenced in al-Suri's diary refers to Barhoumi, or to some other Ubaydah al-Jaza'iri.

We think record evidence amply supports the district court's conclusion that "Ubaydah Al-Jaza'iri" and Barhoumi are one and the same person: al-Suri's diary refers to "Ubaydah" as returning to the Pakistan guesthouse where al-Suri and Zubaydah were staying, and, shortly thereafter, Zubaydah and Barhoumi were in fact captured together in the same Pakistan guesthouse raid; al-Suri's diary refers to "Ubaydah Al-Jaza'iri" as an explosives expert, and Barhoumi admitted to receiving instruction in the use and diffusion of landmines at multiple training camps; al-Suri's diary describes "Ubaydah" as "one of the trainers at Khaldun," and Barhoumi concedes that he trained at the Khaldan camp (though not that he was a trainer there). Barhoumi's theory—that he is not the "Ubaydah" referred to in al-Suri's diary—therefore must rest on the premise that there was a second Algerian staying with Zubaydah at the same Pakistan guesthouse who, like Barhoumi, also went by the alias Ubaydah al-Jaza'iri, was at the Khaldan camp, and trained in the use of landmines or explosives. Without hazarding a guess as to the probability of such a coincidence, we have little difficulty concluding that the district court did not clearly err in finding that "Ubaydah Al-Jaza'iri"—Barhoumi's admitted alias—in fact refers to Barhoumi.

In sum, then, record evidence shows (1) that Barhoumi trained at the Khaldan camp, which was associated with Zubaydah; (2) that he was later captured along with Zubaydah in the same Pakistan guesthouse; and (3) that he functioned as a "Permanent" member of Zubaydah's group who provided explosives training to other militia members "for operations

against the Americans inside of Afghanistan." This evidence shows more than "mere sympathy" toward Zubaydah's organization: al-Suri's diary singles him out as a member of that organization, actively engaged in training other members. *Hamlily*, 616 F. Supp. 2d at 75 (quoting *Gherebi v. Obama*, 609 F. Supp. 2d 43, 68 (D.D.C. 2009)). This certainly qualifies as "function[ing] and participat[ing] within or under the command structure of the organization," *id.*, and, contrary to Barhoumi's argument, amounts to more than just "guilt by association" based on an "attenuated correlation in his travel patterns with Zubaydah and the mysterious al-Suri," Appellant's Br 37. We therefore conclude that all of this evidence, if reliable—a question we turn to in the next section—is sufficient to sustain the district court's determination that the United States is lawfully detaining Barhoumi under the AUMF.

In reaching this conclusion, we emphasize that we have not relied on ████████'s diary. This obviates the need to determine whether, as Barhoumi contends, that diary is unreliable by virtue of ████████'s alleged mental illness, or whether, as the government argues, the ████████ and al-Suri diaries serve to corroborate each other. Nor have we relied on interrogation statements made by another detainee, Benyam Muhammad, who identified Barhoumi as "Ubaida" and stated that Barhoumi was providing "Abu Muslim" and "Hatif" with electronics training at the Faisalabad guesthouse, but whom Barhoumi asserts is an unreliable source because he was allegedly rendered abroad and tortured some time prior to making these statements.

*Reliability of the al-Suri Diary*

Although under *Al-Bihani* and *Awad* hearsay evidence is always admissible in Guantanamo habeas proceedings, such evidence must be accorded weight only in proportion to its reliability. *See Al-Bihani*, 590 F.3d at 879 ("[T]he question a

habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits"). Barhoumi contends that the al-Suri diary is unreliable and that the district court therefore clearly erred in considering it. In pressing this argument, Barhoumi leans heavily on *Parhat*. Although we agree with Barhoumi that *Parhat* sets the guideposts for our inquiry into the reliability of the hearsay diary evidence, we disagree with his characterization of that case and with his assertion that *Parhat* dictates that the al-Suri diary is inherently unreliable.

In *Parhat*, we reviewed a CSRT determination that the petitioner, a Chinese citizen of Uighur ethnicity, qualified as an enemy combatant because he was affiliated with a Uighur independence group "associated" with al-Qaida and the Taliban. The Tribunal's conclusion rested almost entirely on hearsay statements contained in four classified intelligence documents—one from the State Department and three from the Department of Defense—regarding activities allegedly undertaken by the independence group. Although the CSRT procedures allowed for consideration of hearsay evidence, the intelligence documents relied on by the CSRT merely described activities as "having 'reportedly' occurred, [and] as being 'said to' or 'reported to' have happened." *Parhat*, 532 F.3d at 846. The documents did not state "who 'reported' or 'said' or 'suspected' those things. Nor [did] they provide any of the underlying reporting upon which the documents' bottom-line assertions [were] founded." *Id.* at 846–47. Explaining that these deficiencies precluded both the Tribunal and the court from assessing the reliability of the assertions made in those documents, we set aside the CSRT's enemy combatant determination, thus rejecting "the government's contention that it can prevail by submitting documents that read as if they were indictments or civil complaints, and that simply assert as facts the elements required to prove that a

detainee falls within the definition of enemy combatant." *Id.* at 850.

According to Barhoumi, the al-Suri diary, like the intelligence reports at issue in *Parhat*, lacks sufficient indicia of reliability to justify the district court's decision to rely on it. But the problem with the intelligence reports at issue in *Parhat* was that they failed to provide "any of the underlying reporting upon which the documents' bottom-line assertions are founded," thus inhibiting our ability to evaluate the reliability of those assertions. *Id.* at 846–47. Here, the diary, more than 65 pages of detailed observations recorded by a self-professed associate of both Zubaydah and Barhoumi, *is* the underlying reporting on which the government's assertions are founded. Thus, unlike the situation we faced in *Parhat*, here we are "able to assess the reliability of [the] evidence ourselves" by evaluating the diary's internal coherence as well as its consistency with uncontested record evidence, including Barhoumi's own statements and the circumstances of his capture. *Id.* at 848. Conducting that assessment, which was not possible in *Parhat*, we conclude that the al-Suri diary contains sufficient indicia of reliability to justify the district court's reliance on it.

To begin with, Barhoumi acknowledges that the diary was recovered in the ███████████. This provides independent verification of al-Suri's diary entry, just a few days before their capture, that Zubaydah and Barhoumi were staying in the same Pakistan guesthouse, which, again, Barhoumi himself acknowledges. It also reduces any concern that the diary is a government fabrication. Further reinforcing its reliability, the diary refers accurately and in great detail to verifiable real-world events. For example, the diary paints a detailed portrait of the battle of Tora Bora, which al-Suri correctly reports as having taken place in December 2001. Al-Suri also makes reference to several key players in the war: he alludes to injuries sustained by Dr. Ayman al-

Zawahiri when fleeing Tora Bora at bin Laden's behest; Mohamed Atta's role as an "airplane hero" in the September 11, 2001, attacks; Mullah Omar's efforts to reconstitute the Taliban in the wake of the U.S. invasion; and the assumption of the presidency by Hamid Karzai, whom al-Suri refers to as a "carbon copy of the former King Zhahir Shah." Of course, we recognize that al-Suri could have discovered this information from readily available news sources. Our only point is that al-Suri's lengthy and highly detailed descriptions of real-world persons, places, and events tend to enhance the credibility of the diary as a whole.

Furthermore, although it is true, as Barhoumi emphasizes, that the government has provided no information about al-Suri, the diary itself suggests that al-Suri possessed first-hand knowledge of Zubaydah and his organization. Al-Suri refers to himself as a "Permanent" member of Zubaydah's militia who, like Barhoumi, had trained at the Khaldan camp. Al-Suri also demonstrates a familiarity with Zubaydah's activities—not just his comings and goings, but also more intimate details such as where he sleeps and when he shaves. Indeed, the circumstances of the diary's recovery—███████████████████████████████████████████—reinforces the conclusion that al-Suri knew both Zubaydah and Barhoumi, thus enhancing the credibility of his depiction of Barhoumi's role in Zubaydah's organization.

Barhoumi's own statements further buttress the diary's reliability. As noted above, Barhoumi admitted to being trained in mine diffusion; the diary refers to him as an explosives expert. Barhoumi admitted to training at the Khaldan camp; the diary refers to him as "one of the trainers at Khaldun." The al-Suri diary is therefore a far cry from the "bare assertions" deemed unreliable in *Parhat*, 532 F.3d at 847, as it possesses both endogenous and exogenous indicia of reliability.

Challenging this conclusion, Barhoumi argues that because the government chose to present the al-Suri diary as part of a "raw" intelligence report, *Parhat* compels us to conclude that it "'lack[s] sufficient indicia of the statements' reliability' to be reliable." Appellant's Br. 28–29 (quoting *Parhat*, 532 F.3d at 836). But nothing in *Parhat* establishes a per se rule that information contained in an intelligence report is inherently unreliable. Indeed, in *Parhat* we clarified that "we do *not* suggest that hearsay evidence is never reliable— only that it must be presented in a form, or with sufficient additional information, that permits . . . [the] court to assess its reliability." 532 F.3d at 849. We also acknowledged that an intelligence report's reliability can be assessed by comparison to "exogenous information"—so long as such information is, in fact, available. *Id.* at 848. Even though the al-Suri diary is contained in an intelligence report, it represents a discrete piece of physical evidence, and the nature and reliability of that evidence is not altered just because it bears the label "intelligence."

Barhoumi also challenges the reliability of the al-Suri diary by pointing to alleged inconsistencies with ███████'s diary. As noted above, we have not relied on ███████'s diary to accept the district court's conclusion that the evidence shows that it is more likely than not that Barhoumi was "part of" Zubaydah's organization. Nevertheless, we cannot disregard Barhoumi's claim of inconsistency, as any significant discrepancy between the diaries could serve to undermine the credibility of al-Suri's diary as a whole.

The primary inconsistency identified by Barhoumi relates to the diaries' passages concerning Barhoumi's alleged return from Tora Bora. The district court concluded that both diaries tell essentially the same story: that Barhoumi returned from Tora Bora and reported that 300 "brothers" engaged in battle there. The court made this assumption even though the relevant portion of ███████'s diary referred simply to a

"brother" as arriving from Tora Bora, while al-Suri cited "Ubaydah" as making that trip. Barhoumi complains that the government's assertion that the two diaries refer to "the same person is pure speculation because ███████" provides neither a name nor any "other identifying information for the 'brother.'" Reply Br. 10. Reinforcing this argument, Barhoumi points out that, as the district court recognized, these diary entries are dated roughly three weeks apart: ███████'s is dated January 30, 2002; Al-Suri's is dated February 21, 2002.

We agree with Barhoumi that three weeks is too large a mismatch to support the district court's conclusion that the diary entries depict the same event. That said, al-Suri's diary includes another description of a "brother" arriving from Tora Bora that is more in line with ███████'s entry. Dated February 4, 2002, the al-Suri diary entry reports that "[a]fter breakfast, our brother Sulman al-Najdi (who came from Tora Bora) told us about a battle he witnessed." Recounting the battle, al-Najdi reported that the "bombardment was accompanied with malicious attacks by the spiteful, the hypocrite and the collaborator Shi'a and the tribe of ((Hadrat 'Ali)) who still is causing worries to the Taliban in Jalalabad." This report is similar to ███████'s, dated just five days earlier, which recounts that the "brother" who came from Tora Bora described "the betrayal of some tribes and apostate commanders, such as (Hadrat Ali), may God afflict him with what he deserves." In other words, both ███████ and al-Suri seem to recount the same story about a "brother" who arrived from Tora Bora and detailed the perceived betrayal suffered there at the hands of a hostile tribe—and that "brother" is not Barhoumi. Under this interpretation, then, the date discrepancy between the ███████ and al-Suri entries describing the 300 fighters who remained at Tora Bora does nothing to undermine the reliability of al-Suri's account; the dates differ simply because, as Barhoumi himself suggests, the reports stem from different sources. Only the al-

Suri diary refers to Barhoumi as arriving from Tora Bora, and ███████'s diary contains nothing that contradicts that account.

Barhoumi's remaining challenge to the reliability of the al-Suri diary is somewhat more troubling. He argues that the government's refusal to make available a facsimile of the al-Suri diary in its original Arabic or to provide any information as to the qualifications or motives of its translator raises further doubts as to its reliability. In support, Barhoumi cites to a line of cases concerning the "language conduit rule," which holds that "except in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay." *United States v. Martinez-Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000) (internal quotation marks omitted). Some courts have carved out a "narrow exception" to this rule "where the particular facts of a case cast significant doubt upon the accuracy of a translated confession." *United States v. Vidacak*, 553 F.3d 344, 352 (4th Cir. 2009) (internal quotation marks omitted). Contending that this is just such a case, Barhoumi suggests that the same underlying reliability concerns that cause some courts to deem a translation to be hearsay means that the translation of al-Suri's diary is unreliable. We disagree.

As an initial matter, we note that the language conduit rule pertains to the question whether a translation, usually of a party-opponent's statements, creates an additional level of hearsay and is thus inadmissible unless the translator testifies in court. Here, however, we have already crossed that bridge: the al-Suri diary is unquestionably hearsay, but nonetheless admissible as a matter of law pursuant to *Al-Bihani* and *Awad*. The question in this case, then, is not a binary one— admissibility vs. inadmissibility—but rather concerns the degree of reliability exhibited by the diary. Although we accept that the additional layer of hearsay added by the

diary's translation renders it somewhat less reliable than it otherwise would be (particularly if the government had provided information regarding its translation), we nonetheless reject Barhoumi's contention that the district court therefore clearly erred in relying on the diary.

The only translation deficiencies alleged by Barhoumi spring from translator notations appearing in the section of the diary discussing Ubaydah Al-Jaza'iri's description of his flight from Tora Bora. One such notation states as follows: "(TN: The following subparagraph presents text from the page numbered 56 by the Author. The page is undated, but seems to be a continuation of the entry begun on 21 February in subparagraph (ZZ) above.)". In part because these notations reflect some uncertainty as to whether the passage in question comes immediately after the report that Ubaydah arrived from Tora Bora, Barhoumi contends that there "is no indication whatsoever in the al-Suri Diary that the person describing the battle [in the subsequent passage] was 'Ubaydah,'" nor "that the person providing the report participated in the battle." Reply Br. 13; *see also* Oral Arg. Tr. at 39–40 (suggesting that "gaps in the diaries" cast doubt on the Tora Bora account). But we need not accept the government's assertion that Barhoumi fought at Tora Bora to sustain the district court's conclusion that Barhoumi was "part of" Zubaydah's militia; as Barhoumi himself concedes, it is sufficient for the government to show that he was "part of" an "associated force" engaged in hostilities against U.S. or coalition forces. *See Al-Bihani*, 590 F.3d at 872 (explaining that under the "part of" criterion, the President can lawfully detain "an individual who was part of . . . Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners" (internal quotation marks omitted)). Thus, although it seems clear to us that the person describing the battle in al-Suri's diary was in fact "Ubaydah," any lack of clarity on that score is immaterial.

More generally, we reject Barhoumi's suggestion that the translator's forthrightness regarding uncertainties surrounding the date of particular diary entries somehow taints the reliability of the diary as a whole. If our analysis of the district court's decision rested on al-Suri writing a particular passage on a particular date, the absence of a date on that page of the diary might well have significance. But al-Suri's statement that Barhoumi is a "Permanent" member of Zubaydah's militia is inculpatory regardless of the date on which that statement was made, and Barhoumi gives us little reason to suspect—nor does he even argue—that the translator erred in translating this portion of the diary. Indeed, Barhoumi's only argument regarding the "membership list" passage is that the district court erred in concluding that he is the "Ubaydah Al-Jaza'iri" referred to in that entry—an argument we reject above.

We understand Barhoumi's frustration about the government's steadfast refusal to provide any information regarding al-Suri or the circumstances surrounding the translation of his diary. Ultimately, however, our charge is to determine whether, based on the entirety of the evidence, the district court clearly erred in relying on the diary—not whether we would have accorded it different weight had we been sitting as trier of fact. *See Awad*, slip op at. 14–15 (considering "whether the district court, in light of *all* of the evidence, made an erroneous finding that [the detainee] was 'part of' al Qaeda"). The diary was recovered in the ███ ███████████████████████████████████; its author displays first-hand knowledge of both Zubaydah and Barhoumi, as well as the operations of Zubaydah's militia; and the diary bears numerous consistencies with Barhoumi's own uncontested testimony and verifiable real-world events. Given this, and notwithstanding some of the legitimate concerns raised by Barhoumi, we cannot say that we are "left with the definite and firm conviction that a mistake has been committed" by the district court in relying on the al-Suri

diary. *Anderson*, 470 U.S. at 573 (internal quotation marks omitted).

## IV.

For the reasons set forth above, we detect no reversible error in the district court's finding, based on the al-Suri diary, Barhoumi's uncontested testimony, and the circumstances of his capture, that it is more likely than not that Barhoumi was "part of" an al-Qaida-associated force and therefore properly detained pursuant to the AUMF. We therefore affirm the district court's denial of Barhoumi's petition for a writ of habeas corpus.

*So ordered.*