PUBLIC COPY - CLASSIFIED INFORMATION DELETED

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 16, 2011      Decided January 27, 2012

No. 10-5292

ABDUL-RAHMAN ABDO ABULGHAITH SULEIMAN,
APPELLANT

v.

BARACK OBAMA, PRESIDENT, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-02386)

---

*Thomas P. Sullivan* argued the cause for the appellant. With him on the briefs was *Som P. Dalal.*

*John A. Drennan* argued the cause for the appellees. With him on the briefs were *Tony West* and *Robert M. Loeb.*

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

2

GRIFFITH, *Circuit Judge:*[*] Abdul-Rahman Abdo Abulghaith Suleiman appeals the district court's denial of his petition for a writ of habeas corpus challenging his detention at Guantanamo Bay. For the reasons set forth below, we affirm the district court's order.

I

Suleiman's appeal challenges both the finding of the district court that he was part of the Taliban and its conclusion that such a finding justifies his detention. On this latter point, Suleiman argues that detention based solely on being part of the Taliban violates the Due Process and Ex Post Facto Clauses of the Constitution and is not permitted by the Authorization for Use of Military Force (AUMF), § 2(a), Pub. L. No. 107-40, 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note). But we need not take up these legal arguments because Suleiman failed to make them below. *See Salazar v. District of Columbia*, 602 F.3d 431, 436 (D.C. Cir. 2010) ("To preserve a claim of error on appeal, a party typically must raise the issue before the trial court . . . . 'No procedural principle is more familiar . . . than that a . . . right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" (quoting *In re Sealed Case*, 552 F.3d 841, 851-52 (D.C. Cir. 2009)) (internal quotation marks omitted)). In any event, our precedent provides a clear rule of decision: if Suleiman was part of the Taliban, he can be detained. *See Al Alwi v. Obama*, 653 F.3d 11, 16 (D.C. Cir. 2011) ("As this court has now repeatedly

---

[*] **NOTE:** Portions of this opinion contain **Classified Information**, which has been redacted.

held, the AUMF 'gives the United States government the authority to detain a person who is found to have been "part of" al Qaeda or Taliban forces.'" (quoting *Al Odah*, 611 F.3d at 10)).

The only issue we need examine then is whether the district court erred in concluding that Suleiman was part of the Taliban. That determination is a mixed question of law and fact. *See Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010) ("Determining whether Awad is 'part of' al Qaeda is a mixed question of law and fact."). The district court's findings about what actually occurred — the route Suleiman traveled, where he stayed, and what he did — are questions of fact we review for clear error. Whether those facts are sufficient to conclude that Suleiman was part of the Taliban is a question of law that we review de novo. On both questions, we affirm the district court.

## II

Although there was contested evidence about Suleiman's alleged relationship to Al Qaeda, the district court based its decision on three unchallenged pieces of evidence: Suleiman's own testimony before the district court; a Federal Bureau of Investigation field document summarizing an April 17, 2002, interview; and a Department of Defense record of an August 19, 2004, interview. *See Sulayman v. Obama*, 729 F. Supp. 2d 26, 42 (D.D.C. 2010).

Suleiman was born in Taiz, Yemen, in 1979. Shortly after completing high school, he met a Taliban recruiter named Abu Khulud at a mosque in Taiz. Suleiman claims that he did not know that Khulud was a Taliban recruiter when they met.

4

Khulud suggested that Suleiman travel to Afghanistan, where he could own a home and find a wife, and Suleiman agreed to go. Khulud provided him with a Yemeni passport, an airplane ticket to Karachi, Pakistan, and $100 cash.

Once in Karachi, Suleiman took a bus to Quetta, Pakistan, where he stopped for an hour at the Daftur guesthouse, which Khulud had told Suleiman was affiliated with the Taliban. Suleiman next traveled by car from Quetta over the border at Spin Buldak to Kandahar, Afghanistan, and stayed for approximately two weeks at a guesthouse that he described as "the Arab house," which had "Afghan guards" and "weapons stored in a small room." From Kandahar, Suleiman traveled to Kabul and stayed for seven months at a guesthouse owned by a Yemeni national, Hamza Al-Qa'eity, who lived there with his family. While there, Suleiman paid for neither his food nor his lodging, made no attempt to find a wife or job, and did no work. He claims he spent his time eating, sleeping, reading, and praying.

Others living at the Al-Qa'eity guesthouse while Suleiman was there traveled to and from the nearby battlefront to fight with the Taliban against the Northern Alliance. Suleiman himself twice visited an area he described as a "safe place" that was used by Taliban fighters as a staging area for final preparations before fighting at the front. On his first visit, which took place while he was living with Al-Qa'eity, Suleiman stayed for seven days and fired a machine gun, although he claims he did so only for amusement. His second visit, which lasted twelve days, came as he was fleeing Kabul to escape aerial bombing by the United States in retaliation for the attacks of September 11, 2001, and the domestic reprisals following the assassination

of Northern Alliance leader Ahmad Shah Massoud. During this second visit to the Taliban "safe place," Suleiman was armed with an AK-47. From there, he made his way toward Pakistan and into the mountains outside Jalalabad. He eventually crossed by foot into Pakistan, where he was captured by Pakistani authorities in late December 2001. Soon after, he was transferred to the custody of the United States military, and in February 2002, he was sent to Guantanamo Bay.

### III

Our task is to determine whether this undisputed evidence provides a legally adequate basis for the district court's conclusion that Suleiman was part of the Taliban. We have previously stated that "the purely independent conduct of a freelancer is not enough to establish that an individual is 'part of' al-Qaida," and the same is true for being part of the Taliban. *Salahi v. Obama*, 625 F.3d 745, 752 (D.C. Cir. 2010) (quoting *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010)). But the facts here show that Suleiman was no freelancer.

There is no dispute that Suleiman's travel was initiated at the suggestion of and facilitated by a Taliban recruiter, and that he traveled a well-worn path to Afghanistan frequently used by Taliban recruits. We have stated that such travel may indicate that an individual traveled to Afghanistan to join the Taliban. *See Al Odah v. United States*, 611 F.3d 8, 14 (D.C. Cir. 2010) ("[I]nterrogation reports of a third party concerning al Qaeda and Taliban travel routes into Afghanistan . . . although far from conclusive . . . suggest[] that an individual using this travel route to reach Kandahar may have done so

because it was a route used by some individuals seeking to enter Afghanistan for the purpose of jihad." (internal citations omitted)).

And Suleiman did much more than travel the route of a Taliban recruit. He lived at the Al-Qa'eity guesthouse for seven months. Suleiman argues that he was allowed to live there out of charity, and that he did nothing more while there than eat, sleep, read, and pray. The district court did not find this explanation credible, and we find no clear error in its credibility determination. The Al-Qa'eity guesthouse was hardly the monastery for contemplation that Suleiman suggests. His Taliban fighter housemates used it as a base to travel to and from the battlefront during the time Suleiman was there. *See Sulayman*, 729 F. Supp. 2d at 47. We have previously held that "a voluntary decision to move to an al-Qaida guesthouse, a staging area for recruits heading for a military training camp, makes it more likely — indeed, very likely — that [the individual] was himself a recruit." *Al-Adahi v. Obama*, 613 F.3d 1102, 1108 (D.C. Cir. 2010). The same is true for a stay at a Taliban guesthouse. Suleiman was hardly stopping by; he spent seven months there. In addition, the government introduced a declaration before the district court testified that the "Arab house" served as a "Taliban-sponsored guesthouse for Arab mujahedeen in Kandahar" and "was used as a transition point and in-processing location for individuals going to train at various training camps." *Id.* at 31. The

district court also found significant

Finally, we see no error in the district court's conclusion that Taliban fighters would be unlikely to allow an armed Suleiman to twice visit their staging area and be among fighters preparing for battle unless he was part of them. *See Sulayman*, 729 F. Supp. 2d at 52.

From these undisputed facts, we conclude that the evidence on which the district court relied was sufficient to determine that Suleiman was more likely than not part of the Taliban. Because these facts alone are enough to support our conclusion, we agree with the district court that the government's other claims regarding Suleiman's alleged activities in Afghanistan need not be considered. *Id.* at 44 n.14.

Suleiman also seeks leave to file a supplemental appendix that includes a new translation of his October 27, 2004, Combatant Status Review Tribunal (CSRT) testimony. We grant the motion and conclude that there are no significant differences in the new translation of the CSRT that change our analysis.

8

IV

For the foregoing reasons, the order of the district court is

*Affirmed.*