# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 27, 2013　　　　Decided December 3, 2013

No. 11-5102

ABDUL RAZAK ALI, DETAINEE,
APPELLANT

v.

BARACK OBAMA, PRESIDENT, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01020)

*H. Candace Gorman* argued the cause and filed the briefs for appellant.

*Sydney Foster*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Ian Heath Gershengorn*, Deputy Assistant Attorney General, and *Robert M. Loeb*, Attorney, U.S. Department of Justice. *Matthew M. Collette* and *Douglas N. Letter*, Attorneys, U.S. Department of Justice, entered appearances.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

Opinion concurring in the judgment filed by *Senior Circuit Judge* EDWARDS.

KAVANAUGH, *Circuit Judge*: The United States is engaged in an ongoing war against al Qaeda, the Taliban, and associated forces. In March 2002, as part of that war, Abdul Razak Ali was captured by U.S. and Pakistani forces at a four-bedroom house in Faisalabad, Pakistan. After Ali's capture, the U.S. military detained him as an enemy combatant. Since June 2002, Ali has been held at the U.S. Naval Base in Guantanamo Bay, Cuba.

When captured at the house in Pakistan, Ali was with an al Qaeda-associated terrorist leader named Abu Zubaydah. Also present were four former trainers from a terrorist training camp in Afghanistan, multiple experts in explosives, and an individual who had fought alongside the Taliban. Their living quarters contained documents bearing the designation "al Qaeda," electrical components, and a device typically used to assemble remote bombing devices. At the time of his capture, Ali had been at the terrorist guesthouse for about 18 days. Soon after the capture, an FBI interrogator asked Ali for his name and nationality. Ali falsely identified himself as Abdul Razzaq of Libya. Ali maintained that lie for the next two years.

That much is undisputed. In addition, the record strongly suggests, and the District Court found, two other significant facts: Ali, a native Algerian, traveled to Afghanistan after September 11, 2001, in order to fight in the war against U.S. and Coalition forces. And while at the Pakistan guesthouse,

Ali participated in Abu Zubaydah's terrorist training program by taking English lessons.

Under our precedents, we conclude that those facts justify the President's decision to detain Ali as an enemy combatant pursuant to the 2001 Authorization for Use of Military Force. *See* Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001); *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004). We therefore affirm the judgment of the District Court denying Ali's petition for a writ of habeas corpus.

I

Shortly after the attacks against the United States on September 11, 2001, Congress passed and President George W. Bush signed the Authorization for Use of Military Force. The AUMF provides:

> That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001); *see* U.S. Const. art. I, § 8.

This Court has stated that the AUMF authorizes the President to detain enemy combatants, which includes (among others) individuals who are part of al Qaeda, the Taliban, or associated forces. *See Hussain v. Obama*, 718 F.3d 964, 967

(D.C. Cir. 2013).[1] Detention under the AUMF may last for the duration of hostilities. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004); *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011). This Court has assumed without deciding that, to justify detention of a member of al Qaeda, the Taliban, or an associated force, the Government must prove the detainee's status by a preponderance of the evidence. *See Hussain*, 718 F.3d at 967 n.3; *Uthman*, 637 F.3d at 403 n.3; *Al-Bihani v. Obama*, 590 F.3d 866, 878 & n.4 (D.C. Cir. 2010). In a prior case involving a Guantanamo detainee captured in the same Faisalabad guesthouse as Ali, we recognized that the force commanded by Abu Zubaydah constitutes an "associated force" for purposes of the AUMF. *See Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010). Ali does not dispute that conclusion here.

The only question, then, is whether Ali more likely than not was part of Abu Zubaydah's force. Ali says that he was not. He admits that he was captured with Abu Zubaydah in the Faisalabad, Pakistan, guesthouse. Ali also admits that he

---

[1] As this Court has explained in prior cases, the President may also detain individuals who substantially support al Qaeda, the Taliban, or associated forces in the war. The National Defense Authorization Act for Fiscal Year 2012 expressly permits military detention of a "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners." Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011). And our earlier cases, citing the Military Commissions Act of 2009, permit military detention of a person who was part of or "purposefully and materially" supported al Qaeda, the Taliban, or associated forces in the war. *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010) (quoting 10 U.S.C. § 948a(7)); *see Almerfedi v. Obama*, 654 F.3d 1, 3 n.2 (D.C. Cir. 2011); *Uthman v. Obama*, 637 F.3d 400, 402 n.2 (D.C. Cir. 2011).

lied about his identity from the time of his capture in March 2002 until late 2004, when he admitted that he is really Saeed Bakhouche of Algeria, not Abdul Razzaq of Libya.[2] Ali insists, however, that he mistook the Abu Zubaydah facility for a public guesthouse, and that he had nothing to do with the terrorist activity being planned there.

In 2005, Ali filed a habeas petition contesting his detention. After the Supreme Court ruled in *Boumediene v. Bush*, 553 U.S. 723 (2008), that the habeas corpus right extends to Guantanamo, the District Court took up Ali's case and held a three-day hearing. Based on Ali's presence at the guesthouse with Abu Zubaydah, his participation in Abu Zubaydah's training program, his admission to traveling to Afghanistan to fight in the war against U.S. and Coalition forces, and other evidence connecting Ali to Abu Zubaydah fighters, the District Court concluded that "it is more probable than not that" Ali "was in fact a member of Abu Zubaydah's force." *Ali v. Obama*, 741 F. Supp. 2d 19, 27 (D.D.C. 2011).

On appeal, Ali argues that the Government failed to justify his detention by a preponderance of the evidence. He also contests several procedural aspects of the habeas proceeding, including the Government's alleged failure to disclose evidence that could have undermined the credibility of two detainees who linked Ali to Abu Zubaydah's force.

This Court reviews the District Court's ultimate habeas determination de novo, its underlying factual findings for clear error, and its procedural rulings for abuse of discretion. *See Barhoumi*, 609 F.3d at 423.

---

[2] The District Court spelled Ali's name as Bakhouche. Ali's brief spells it as Bakhouch.

II

The central fact in this case is that Ali was captured in 2002 at a terrorist guesthouse in Pakistan. This Court has explained that a detainee's presence at an al Qaeda or associated terrorist guesthouse constitutes "overwhelming" evidence that the detainee was part of the enemy force. *Uthman v. Obama*, 637 F.3d 400, 406 (D.C. Cir. 2011) (quoting *Al-Adahi v. Obama*, 613 F.3d 1102, 1108 (D.C. Cir. 2010)); *see Alsabri v. Obama*, 684 F.3d 1298, 1302 (D.C. Cir. 2012); *Suleiman v. Obama*, 670 F.3d 1311, 1314 (D.C. Cir. 2012); *Almerfedi v. Obama*, 654 F.3d 1, 6 n.7 (D.C. Cir. 2011); *Al-Madhwani v. Obama*, 642 F.3d 1071, 1075 (D.C. Cir. 2011); *Al-Bihani v. Obama*, 590 F.3d 866, 873 n.2 (D.C. Cir. 2010). We have previously affirmed the detention of an individual captured in the same terrorist guesthouse as Ali. *See Barhoumi v. Obama*, 609 F.3d 416, 425, 427 (D.C. Cir. 2010).

Ali contends that he simply mistook the Abu Zubaydah guesthouse for a public guesthouse. He argues that reliance on his capture in the Abu Zubaydah guesthouse unfairly presumes guilt by association – or, as he styles it, "guilt by guesthouse." Ali Br. 42. That argument has two flaws.

To begin with, we are not talking about "guilt." This is not a criminal proceeding in which the Government asks a court to find Ali guilty and punish him for past behavior by sentencing him to a defined term of imprisonment. In other words, this is not a federal criminal trial or a military commission proceeding for war crimes. Rather, this case involves military detention. The purpose of military detention is to detain enemy combatants for the duration of hostilities so

as to keep them off the battlefield and help win the war. Military detention of enemy combatants is a traditional, lawful, and essential aspect of successfully waging war. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004); WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 788 (rev. 2d ed. 1920) (military detention during wartime "is neither a punishment nor an act of vengeance, but merely a temporary detention which is devoid of all penal character") (internal quotation marks and citation omitted). The standard of proof for military detention is not the same as the standard of proof for criminal prosecution, in part because of the different purposes of the proceedings and in part because military detention ends with the end of the war.

Moreover, determining whether an individual is part of al Qaeda, the Taliban, or an associated force almost always requires drawing inferences from circumstantial evidence, such as that individual's personal associations. Unlike enemy soldiers in traditional wars, terrorists do not wear uniforms. Nor do terrorist organizations issue membership cards, publish their rosters on the Internet, or otherwise publicly identify the individuals within their ranks. So we must look to other indicia to determine membership in an enemy force. As this Court has stated before, a person's decision to stay with the members of a terrorist force at a terrorist guesthouse can be highly probative evidence that he is part of that force and thus a detainable enemy combatant. One does not generally end up at al Qaeda or other terrorist guesthouses in Afghanistan or Pakistan by mistake – either by the guest or by the host. *See Uthman*, 637 F.3d at 406.

In any event, we need not address the hypothetical in which a detainee's presence at a terrorist guesthouse constitutes the *only* evidence against him. In this case, at least

six additional facts support the conclusion that Ali more likely than not was part of Abu Zubaydah's force:

- Ali's housemates at the terrorist guesthouse were not just foot soldiers, but included the terrorist leader Abu Zubaydah himself, as well as the senior leaders of Zubaydah's force.
- Ali had been staying at the guesthouse for about 18 days.
- The guesthouse in which Ali was captured contained documents and equipment associated with terrorist operations.
- Ali participated in Abu Zubaydah's terrorist training program by taking English lessons at the guesthouse.
- Ali had traveled to Afghanistan after September 11, 2001, with the intent to fight in the war against U.S. and Coalition forces.
- After his capture, Ali lied about his identity, and he maintained his false cover story for more than two years.

*First*, it is undisputed that Ali's housemates at the terrorist guesthouse were not just foot soldiers, but included Abu Zubaydah himself, as well as the senior leaders of Zubaydah's force. *See Ali v. Obama*, 741 F. Supp. 2d 19, 26 (D.D.C. 2011). Abu Zubaydah, an "associate" and "longtime ally" of Osama bin Laden, operated terrorist training camps in Afghanistan and led a force that engaged in hostilities against U.S. and Coalition forces. J.A. 1620; THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES 150, 174 (2004); *see Barhoumi*, 609 F.3d at 425; J.A. 1548; 9/11 COMMISSION REPORT at 59. Zubaydah-trained fighters coordinated with or joined al Qaeda, and at least one Zubaydah associate attempted to attack the United States

homeland. *See United States v. Ressam*, 679 F.3d 1069, 1072-74 (9th Cir. 2012) (en banc); J.A. 1548-49, 1620; 9/11 COMMISSION REPORT at 261.[3]

After U.S. and Coalition forces eviscerated al Qaeda and other terrorist training camps in Afghanistan in late 2001, Abu Zubaydah retreated to a house in Faisalabad, Pakistan. He used the Faisalabad house to prepare for attacks on U.S. and Coalition forces using remote-detonated explosives. *See Ali*, 741 F. Supp. 2d at 26; J.A. 1600, 1651, 1736, 1741. Ali admits that he knew Abu Zubaydah and that they lived together at the Faisalabad guesthouse. And they were not alone. Based on statements by guesthouse occupants and a diary kept by an Abu Zubaydah associate, the District Court concluded that approximately 10 senior leaders of Zubaydah's force resided at the guesthouse when Ali was captured there. *Ali*, 741 F. Supp. 2d at 26. In an earlier case, we credited the diary as "probative record evidence" providing a "veritable membership list" for Zubaydah's force. *Barhoumi*, 609 F.3d at 425-26. The members of Zubaydah's force named on that list were not strangers to Ali. He identified them by name and photo, and they identified him.

It strains credulity to suggest that Ali spent time in early 2002 in a four-bedroom house in Faisalabad, Pakistan, with Abu Zubaydah and the leaders of Zubaydah's force while having no idea what the people around him were doing. But

---

[3] Courts in this circuit and others have likewise recognized Abu Zubaydah's association with al Qaeda. *See United States v. Moussaoui*, 591 F.3d 263, 306 (4th Cir. 2010); *Shafiiq v. Obama*, No. 05-1506, 2013 WL 3242201, at *1 (D.D.C. June 5, 2013); *Kandari v. United States*, 744 F. Supp. 2d 11, 48 (D.D.C. 2010); *Mohammed v. Obama*, 689 F. Supp. 2d 38, 58 (D.D.C. 2009); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 561 (S.D.N.Y. 2005).

even granting Ali the benefit of the doubt, it is nearly unfathomable that avowed terrorist leaders like Abu Zubaydah would tolerate an unknown couch-surfer crashing down the hall in the same house for several weeks. Of course, there remains a slender possibility that Ali innocently blundered into his extended stay at a heavily fortified terrorist den. But one of his housemates offered a far more plausible explanation: "all the people in the house were Al-Qaeda people or 'jihadis.'" J.A. 1650-51.

In sum, the fact that Ali resided with Abu Zubaydah and Zubaydah's top lieutenants during their preparation for active conflict with U.S. and Coalition forces strongly buttresses the conclusion that Ali was part of Zubaydah's force. *Cf. Khairkhwa v. Obama*, 703 F.3d 547, 550 (D.C. Cir. 2012) (affirming detention based on detainee's "close ties" to Mullah Omar); *Alsabri*, 684 F.3d at 1301 (affirming detention based on detainee's residence with *U.S.S. Cole* bomber and continuing relationships with Taliban or al Qaeda members); *Al-Adahi*, 613 F.3d at 1107 (affirming detention based on detainee's multiple "personal audience[s]" with Osama bin Laden); *Barhoumi*, 609 F.3d at 425 (affirming detention based on detainee's capture in same guesthouse as Abu Zubaydah); *see generally Uthman*, 637 F.3d at 404 ("company" that detainee "was keeping" can suggest membership in terrorist force); *Hussain v. Obama*, 718 F.3d 964, 969 (D.C. Cir. 2013) (same); *Latif v. Obama*, 677 F.3d 1175, 1197 (D.C. Cir. 2012) (same); *Suleiman*, 670 F.3d at 1314 (same); *Al-Madhwani*, 642 F.3d at 1076 (same); *Esmail v. Obama*, 639 F.3d 1075, 1077 (D.C. Cir. 2011) (same); *Awad v. Obama*, 608 F.3d 1, 9-10 (D.C. Cir. 2010) (same).

*Second*, it is undisputed that Ali had been staying at the guesthouse for about 18 days. J.A. 1666. His stay there was no brief layover on a tourist jaunt through Pakistan. On the

contrary, if Ali were there for innocent purposes, he had more than ample time to recognize the dangerous company he was keeping and leave. Likewise, Abu Zubaydah and the other terrorists at the house had more than ample time to eject someone who was an errant passer-by. The length of Ali's stay makes it all the more implausible that he was an innocent bystander to the terrorist activity at Abu Zubaydah's guesthouse. *Cf. Hussain*, 718 F.3d at 970 ("extended stays" at terrorist-linked mosques suggest affiliation with terrorist force); *Suleiman*, 670 F.3d at 1314 (seven-month stay at Taliban guesthouse shows detainee was "hardly stopping by"); *Almerfedi*, 654 F.3d at 6-7 (extended stay at mosque linked to terrorism suggests terrorist affiliation); *Esmail*, 639 F.3d at 1076 ("length of" detainee's stay at training camp constitutes "particularly strong evidence").

*Third*, it is undisputed that the guesthouse in which Ali was captured contained documents and equipment associated with terrorist operations. The District Court found that the terrorist guesthouse where Ali resided contained "pro-al Qaeda literature, electrical components, and at least one device typically used to assemble remote bombing devices." *Ali*, 741 F. Supp. 2d at 21. Ali does not dispute that those objects were in the guesthouse. Rather, he suggests that the objects have alternative, benign uses. That's true. But electrical components, for example, have a much different connotation when found next to an al Qaeda manual in a terrorist guesthouse than when found in an electrical engineering laboratory. Tellingly, the record included evidence that Abu Zubaydah planned to conduct terrorist attacks using remote-detonated explosives. J.A. 1549, 1600, 1736. Considered in context, the presence of pro-al Qaeda literature, electrical components, and a device typically used to assemble remote bombing devices in the guesthouse where Ali spent about 18 days corroborates other evidence

connecting him to Abu Zubaydah's force. *Cf. Obaydullah v. Obama*, 688 F.3d 784, 792-93 (D.C. Cir. 2012) (explosives found outside detainee's residence suggest membership in terrorist force); *Khan v. Obama*, 655 F.3d 20, 30 (D.C. Cir. 2011) (incriminating items discovered at detainee's properties suggest membership in terrorist force); *Al-Adahi*, 613 F.3d at 1109 (presence of Casio watch identified with terrorist attacks suggests membership in terrorist force).

*Fourth*, the District Court found, and the evidence supports the conclusion, that Ali participated in Abu Zubaydah's terrorist training program by taking English lessons at the guesthouse. At least one of Ali's housemates provided multiple, specific accounts of having witnessed Ali and other housemates taking English lessons from a member of Abu Zubaydah's force. Ali offers no persuasive rebuttal to those detailed eyewitness reports. The District Court did not clearly err by relying on that evidence. *Ali*, 741 F. Supp. 2d at 26.

Ali argues that there is nothing sinister about learning English. That's true in isolation, but again, the context here is important. Otherwise-innocent activity can impart a different meaning depending on the circumstances. Here, the record included evidence that leaders of Abu Zubaydah's force provided English language training to help prepare their members to better infiltrate English-speaking areas and launch successful terrorist attacks. Ali's willingness to participate in such a training program undercuts his claim of ignorance about terrorist activity in the guesthouse and further connects him to Abu Zubaydah's force. *Cf. Alsabri*, 684 F.3d at 1304-06 (training at terrorist facility is compelling evidence that detainee was part of terrorist force); *Al Alwi v. Obama*, 653 F.3d 11, 17-18 (D.C. Cir. 2011) (same); *Al-Madhwani*,

642 F.3d at 1075 (same); *Esmail*, 639 F.3d at 1076 (same); *Al-Adahi*, 613 F.3d at 1108-09 (same).

*Fifth*, the District Court found, and the evidence supports the conclusion, that Ali had traveled to Afghanistan after September 11, 2001, with the intent to fight in the war against U.S. and Coalition forces. Ali admitted as much when, shortly after his capture, he told an FBI interviewer that he had departed Libya in October 2001 for Karachi, Pakistan, and that "he met some Afghans in Karachi who took him to Afghanistan to fight in the war." J.A. 74. Ali does not dispute the "damning" significance of traveling to the battlefield to engage in combat against U.S. and Coalition forces. *Hussain*, 718 F.3d at 968. Instead, he denies making the admission.

The Government contends that Ali admitted his trip to Afghanistan in an FBI interview conducted within 48 hours of his capture. The FBI agent's notes indicate that the interview subject was "Abdul Razzaq," an alias that Ali has admitted using and that multiple housemates associated with him. The interview notes show that Razzaq was born in La Gilat, Libya, in July 1970. The notes also give the names of Razzaq's parents and brother. All of that biographical data matches information later provided by Ali at Guantanamo. As Ali emphasizes, however, the FBI agent's notes also indicate that the interview subject was captured at a different Faisalabad guesthouse where Ali never resided. The Government contends that this notation was inaccurate and points to a later intelligence report correcting the mistake. Ali insists that the initial version – with the inaccurate guesthouse location – proves that he is not the Abdul Razzaq who made the incriminating admission.

Given that multiple Faisalabad guesthouses were raided on the same day, it seems most likely that the agent interviewing Ali simply recorded the wrong site of capture in his initial report. It strikes us as dramatically less plausible that the agent interviewed a *different* Abdul Razzaq who happened to have been born in the same place during the same month of the same year to a family whose members had the same names. Ali's argument amounts to a claim of innocence-by-typo. After hearing all the evidence, the District Court concluded that Ali had made the admission, and that the typo was just a typo. *Ali*, 741 F. Supp. 2d at 26-27. We cannot say that this factual finding amounts to clear error.

*Sixth*, it is undisputed that, after his capture, Ali lied about his identity and maintained his false cover story for more than two years. From the time of his capture in March 2002 until late 2004, Ali told U.S. interrogators that he was Abdul Razzaq of Libya. Then he admitted that he had been giving a false identity all that time, and that he is actually Saeed Bakhouche of Algeria.

Ali's willingness to lie in this fashion is telling. If he were truly an innocent traveler caught in the wrong place at the wrong time, he presumably would have given his real name. After all, Ali claims that he had nothing else in his past to hide. Ali Br. 67. Our prior cases have discussed the more likely explanation for behavior like Ali's: Terrorists are trained "to make up a story and lie." *Al-Adahi*, 613 F.3d at 1111. Here, Ali's sketchy tale bears several of the hallmarks of counter-interrogation techniques that this Court has observed in past cases: "developing a cover story . . . recanting or changing answers . . . [and] giving as vague an answer as possible." *Id.* Whatever his motive, Ali's consistent lying about his name and nationality renders him "wholly incredible." *Ali*, 741 F. Supp. 2d at 27. Moreover,

his willingness to adopt and repeat a false cover story constitutes strong evidence of guilt. *See Al-Adahi*, 613 F.3d at 1107 ("false exculpatory statements are evidence – often strong evidence – of guilt"); *see Hussain*, 718 F.3d at 969 (same); *Latif*, 677 F.3d at 1195 (same); *Almerfedi*, 654 F.3d at 7 (same); *Al-Madhwani*, 642 F.3d at 1076 (same); *Esmail*, 639 F.3d at 1076-77 (same); *Uthman*, 637 F.3d at 407 (same).

To sum up, as the District Court correctly concluded, the record here establishes the following: Ali was captured in a terrorist guesthouse in Pakistan where he resided with Abu Zubaydah and the senior leaders of Zubaydah's terrorist force. Ali had been there for about 18 days. The guesthouse where Ali lived contained materials associated with al Qaeda and terrorism, and Ali participated in at least one component of Abu Zubaydah's training program. Moreover, Ali had traveled to Afghanistan to fight in the war against U.S. and Coalition forces. And after his capture, Ali lied about his identity for more than two years.

Ali maintains that many of those facts, considered individually, could have innocent explanations. Maybe yes, maybe no. But individual pieces of evidence are not considered in complete isolation from one another. *Cf. Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987) ("individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it"). As our precedents have explained, this commonsense principle carries no less weight in habeas proceedings for Guantanamo detainees. *See Hussain*, 718 F.3d at 968; *Uthman*, 637 F.3d at 407; *Al-Adahi*, 613 F.3d at 1105-06.

Considering the facts collectively and in light of our precedents, and exercising de novo review of the District Court's ultimate conclusion, we conclude that the

Government has satisfied its burden to prove that Ali more likely than not was part of Abu Zubaydah's force.[4]  Any alternative account would mean that Ali ended up in the guesthouse by accident and failed to realize his error for more than two weeks; *and* that Abu Zubaydah and his senior leaders tolerated an outsider living within their ranks; *and* that a different Abdul Razzaq who happened to have the same biographical information traveled to Afghanistan after September 11, 2001, to fight in the war against U.S. and Coalition forces; *and* that, despite knowing that he was an innocent man, Ali lied about his true name and nationality for two years.  Ali's story "piles coincidence upon coincidence upon coincidence." *Uthman*, 637 F.3d at 407.  We conclude that the President has authority under the AUMF to detain Ali.[5]

III

In addition to contesting the sufficiency of the evidence supporting his detention, Ali advances several procedural challenges.

*First*, Ali argues that he was entitled to a second habeas hearing because, at his first hearing, the Government

---

[4] We do not imply that all of the evidence discussed here is *necessary* to determine that Ali was part of Abu Zubaydah's force.  We hold only that the evidence here is *sufficient* to demonstrate that Ali was part of Abu Zubaydah's force and therefore sufficient to justify his detention.  *Cf. Uthman v. Obama*, 637 F.3d 400, 407 n.8 (D.C. Cir. 2011).

[5] We reach this conclusion based solely on the evidence we have discussed above.  As noted further below, we need not and do not rely on evidence from two detainees whose credibility Ali has contested, Muhammed Noor Uthman and Musa'ab al-Madhwani.

allegedly failed to disclose evidence that could have undermined the credibility of two detainees who linked him to Abu Zubaydah's force: Muhammed Noor Uthman and Musa'ab al-Madhwani.

The Constitution entitles a Guantanamo detainee to "a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (internal quotation marks and citation omitted); *see* U.S. Const. art. I, § 9. The court reviewing a habeas petition has authority to "admit and consider relevant exculpatory evidence." *Al-Bihani v. Obama*, 590 F.3d 866, 875 (D.C. Cir. 2010) (quoting *Boumediene*, 553 U.S. at 786). In its case management order, the District Court required the Government to disclose any evidence "that tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention." Case Management Order at 2, *Ali v. Obama*, No. 10-1020 (D.D.C. Aug. 25, 2010).

At Ali's habeas hearing, the Government relied on evidence from Uthman and al-Madhwani without disclosing to Ali's counsel certain information that could have undermined the credibility of those detainees. But then the Government formally withdrew reliance on the evidence from al-Madhwani, and the District Court therefore did not consider evidence from him in deciding whether to grant the petition. *Ali v. Obama*, 741 F. Supp. 2d 19, 24 (D.D.C. 2011); *cf. Al-Bihani*, 590 F.3d at 881 (district court "assiduously avoided" relying on facts related to possible error). To be sure, the District Court did initially rely on information from Uthman. But the District Court later made an express finding that Ali would be detainable even without considering any evidence from Uthman. *See Ali v. Obama*,

No. 10-1020, 2011 WL 1897393, at *1 (D.D.C. May 17, 2011).

Like the District Court, we do not rely on evidence from al-Madhwani or Uthman in determining that Ali more likely than not was part of Abu Zubaydah's force. Therefore, any asserted error resulting from the Government's alleged failure to disclose evidence undermining the credibility of those two detainees had no bearing on the outcome of the case in the district court, nor any bearing on the outcome of this appeal. *Cf. Al-Bihani*, 590 F.3d at 881 (asserted error would not require reversal because it "would not have changed the outcome of the case").

*Second*, Ali asserts a variety of challenges related to the Government's presentation of the case, including its decision to amend its factual allegations and renumber its exhibits before the habeas hearing, which allegedly deprived Ali's counsel of time to prepare. None of those claims constitutes an error that justifies reversal on appeal. Far from depriving Ali of a fair hearing, the District Court prudently accommodated Ali's counsel's requests for additional preparation time by rescheduling the habeas hearing from October 2010 to December 2010 and by delaying closing arguments by an extra day. *See* Tr. of Hearing at 81, *Ali v. Obama*, No. 10-1020 (D.D.C. Dec. 15, 2010); Minute Order, *Ali v. Obama*, No. 10-1020 (D.D.C. Oct. 4, 2010); Motion to Reschedule Habeas Hearing, *Ali v. Obama*, No. 10-1020 (D.D.C. Sept. 15, 2010). At the same time, the District Court appropriately moved the case along promptly, consistent with the Supreme Court's directive in *Boumediene*. *See Boumediene*, 553 U.S. at 795.

*Third*, Ali cursorily alleges judicial bias by the District Judge. That claim lacks merit. Ali does not identify any

actions that demonstrate improper judicial bias. Consistent with Supreme Court precedent, Ali received "a meaningful opportunity" to contest his detention. *Id.* at 779.

\* \* \*

Based on the evidence that we have outlined, Ali more likely than not was part of Abu Zubaydah's force. To be sure, as in any criminal or civil case, there remains a *possibility* that the contrary conclusion is true – in other words, that Ali was not part of Abu Zubaydah's force. But the preponderance standard entails decisions based on the more likely conclusion. In our judgment, the evidence here demonstrates that Ali more likely than not was part of Zubaydah's force. The President therefore has authority to detain Ali under the 2001 Authorization for Use of Military Force.

In reaching our conclusion, we emphasize that this is not a federal criminal or military commission proceeding. Ali is not being criminally punished for his past behavior. Rather, the United States is detaining Ali because of his status as an enemy combatant in an ongoing war. Such military detention is a traditional, lawful, and essential part of successfully waging war. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004). Importantly, the standard of proof for such military detention is not the same as the standard of proof for criminal punishment, in part because the purpose of detention is not punishment and in part because military detention – unlike a criminal or military commission sentence – comes to an end with the end of hostilities.

We are of course aware that this is a long war with no end in sight. We understand Ali's concern that his membership in Zubaydah's force, even if it justified detention as an enemy combatant for some period of time, does not

justify a "lifetime detention." Reply Br. 28 (capitalization altered). But the 2001 AUMF does not have a time limit, and the Constitution allows detention of enemy combatants for the duration of hostilities. *See Hamdi*, 542 U.S. at 521; *compare* USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 224, 115 Stat. 272, 295 (numerous provisions set to expire on December 31, 2005). The war against al Qaeda, the Taliban, and associated forces obviously continues. Congress and the President may choose to make long-term military detention subject to different, higher standards. Indeed, for many years now, under the direction of two Presidents, the Executive Branch has unilaterally conducted periodic reviews and released or transferred to foreign countries a large number – in fact, the vast majority – of Guantanamo detainees. Many releases or transfers have likewise occurred with detainees who have been held on U.S. bases in foreign countries (and outside of the courts' habeas jurisdiction, *see Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010)). But absent a statute that imposes a time limit or creates a sliding-scale standard that becomes more stringent over time, it is not the Judiciary's proper role to devise a novel detention standard that varies with the length of detention. The only question before us is whether the President has authority under the AUMF to detain Ali. In conducting that analysis, we must apply the same standard in 2013 that we would have applied in the aftermath of Ali's capture in 2002.

We affirm the judgment of the District Court denying Ali's petition for a writ of habeas corpus.

*So ordered.*

EDWARDS, *Senior Circuit Judge*, concurring in the judgment. The Authorization for Use of Military Force ("AUMF") provides:

> That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines *planned, authorized, committed, or aided the terrorist attacks* that occurred on September 11, 2001, or *harbored such organizations or persons*, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) (emphasis added). In the National Defense Authorization Act for Fiscal Year 2012 ("NDAA"), Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011), Congress reaffirmed the provisions of the AUMF. The NDAA added a provision saying that "covered persons" include a "person who was a *part of or substantially supported* al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States . . . , including any person who has *committed a belligerent act* or has directly supported such hostilities in aid of such enemy forces." *Id.* § 1021(b)(2) (emphasis added).

Abdul Razak Ali's habeas petition has been denied in this case because, as the majority says,

> Ali was captured in a terrorist guesthouse in Pakistan where he resided with Abu Zubaydah and the senior leaders of Zubaydah's terrorist force. Ali had been there for about 18 days. The guesthouse where Ali lived contained materials associated with al Qaeda and terrorism, and Ali participated in at least one component of Abu Zubaydah's training program [by taking English lessons]. Moreover, Ali had traveled to Afghanistan to fight in the war . . . .

Nothing in the record indicates that Ali "planned, authorized, committed, or aided the terrorist attacks" of September 11, 2001, or that he "harbored [terrorist] organizations or persons," or that he was "part of or substantially supported al-Qaeda, the Taliban, or associated forces," or that he "committed a belligerent act" against the United States. Ali may be a person of some concern to Government officials, but he is not someone who transgressed the provisions of the AUMF or the NDAA. Ali's principal sin is that he lived in a "guest house" for "about 18 days."

The majority attempts to overcome this disjunction between Ali's alleged actions and the conduct prohibited by the AUMF and the NDAA by pointing to Ali's "*personal associations*" with Abu Zubaydah during Ali's very brief stay in the guest house. The majority's reliance on a "personal associations" test to justify its conclusion that Ali is detainable as an "enemy combatant" rests on the case law from this circuit cited in the majority opinion, which I am bound to follow. However, what is notable here is that there is a clear disjunction between the law of the circuit and the statutes that the case law purports to uphold. In other words, the "personal associations" test is well beyond what the AUMF and the NDAA prescribe.

The majority explains that "[t]he purpose of military detention is to detain enemy combatants for the duration of hostilities so as to keep them off the battlefield and help win the war." This is indisputable, but it is no consolation for Ali because the result of our judgment today is that Ali may now be detained for life.

The majority acknowledges, as it must, that the "war against al Qaeda, the Taliban, and associated forces obviously

continues," and there is no end in sight. Our Nation's "war on terror" started twelve years ago, and it is likely to continue throughout Ali's natural life. Thus, Ali may well remain in prison for the rest of his life. It seems bizarre, to say the least, that someone like Ali, who has never been charged with or found guilty of a criminal act and who has never "planned, authorized, committed, or aided [any] terrorist attacks," is now marked for a life sentence.

The majority says that "it is not the Judiciary's proper role to devise a novel detention standard that varies with the length of detention." Respectfully, in my view, that is not the issue. The troubling question in these detainee cases is whether the law of the circuit has stretched the meaning of the AUMF and the NDAA so far beyond the terms of these statutory authorizations that habeas corpus proceedings like the one afforded Ali are functionally useless.